No. 20-56327

# 𝔍𝔫 𝔱𝔥𝔢 𝔘𝔫𝔦𝔱𝔢𝔡 𝔖𝔱𝔞𝔱𝔢𝔰 ℭ𝔬𝔲𝔯𝔱 𝔬𝔣 𝔄𝔭𝔭𝔢𝔞𝔩𝔰
# 𝔉𝔬𝔯 𝔱𝔥𝔢 𝔑𝔦𝔫𝔱𝔥 ℭ𝔦𝔯𝔠𝔲𝔦𝔱

NICHOLAS SHONER,

*Plaintiff-Appellant*,

and

PAUL CORMIER

*Plaintiff*

v.

CARRIER CORPORATION

*Defendant-Appellee.*

On Appeal from the United States District Court
for the Central District of California
No. 2:18-cv-07030-CAS-E
Hon. Christina A. Snyder

## APPELLANT'S OPENING BRIEF

Timothy N. Mathews
CHIMICLES SCHWARTZ KRINER
& DONALDSON-SMITH LLP
One Haverford Centre
361 West Lancaster Avenue
Haverford, PA 19041
Telephone: (610) 642-8500
tnm@chimicles.com

James C. Shah
MILLER SHAH LLP
1845 Walnut Street, Suite 806
Philadelphia, PA 19103
Telephone: (610) 891-9880
jcshah@millershah.com

*Counsel for Plaintiff-Appellant*

## **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ....................................................................... iv

INTRODUCTION ................................................................................1

JURISDICTIONAL STATEMENT .........................................................3

ISSUES PRESENTED..........................................................................4

STATUTORY AUTHORITIES .............................................................5

STATEMENT OF THE CASE...............................................................5

    A.    Statement of the Facts ..........................................................5

        (1)    Background Information...........................................5

        (2)    The Unapproved Rust Inhibitor and Carrier's Actions...............7

        (3)    Shoner's Air Conditioner Failures and His Pre-Suit
               Demand for Replacement or Repair .........................11

    B.    Procedural History.............................................................14

    C.    The Relevant Decisions in the Related *Oddo* Case.............................15

    D.    The Decision Below Granting Carrier's Motion to Dismiss...............18

SUMMARY OF THE ARGUMENT .....................................................20

STANDARD OF REVIEW .................................................................22

ARGUMENT .....................................................................................23

I.    The district court erred in holding that Shoner's pre-suit
    demand letter was not sufficiently specific merely because his
    air conditioner was functioning after injection with A/C Re-New .............23

II.    The district court erred in dismissing Shoner's implied warranty claim ......27

A. Shoner adequately pleads a claim for breach of implied warranty under Rule 8 pleading standards ........................................................27

    1. The rust inhibitor is objectionable in the trade. ........................28

    2. Air conditioners containing the rust inhibitor are not of fair or average quality. .............................................................30

    3. Shoner's air conditioner was not fit for ordinary use at the time of sale ..........................................................................31

B. The district court erred in holding that Shoner could not state a claim merely because his air conditioner was working at the time of the complaint...........................................................................32

III. The district court erred in dismissing Shoner's express warranty claim.......41

A. Carrier breached its express warranty when it sold air conditioners containing a manufacturing defect and again when it failed to replace necessary parts ...........................................................42

B. If Carrier's warranty was insufficient to actually remedy the defect, then the warranty failed of its essential purpose ..............46

IV. The district court erred in dismissing Shoner's MMWA claim because he sufficiently alleges breach of implied and express warranty claims under state law ...............................................................................................50

CONCLUSION ...................................................................................................52

STATEMENT OF RELATED CASES ................................................................54

CERTIFICATE OF COMPLIANCE....................................................................54

CERTIFICATE OF SERVICE .............................................................................55

ADDENDUM .......................................................................................................56

# TABLE OF AUTHORITIES

## Cases

*Albright v. Sherwin-Williams Co.*,
  2019 U.S. Dist. LEXIS 187418 (N.D. Ohio Jan. 29, 2019) ..............................50

*Am. Bumper & Mfg. Co. v. Transtechnology Corp.*,
  652 N.W.2d 252 (Mich. Ct. App. 2002)............................................................24

*Ambassador Steel Co. v. Ewald Steel Co.*,
  190 N.W.2d 275 (Mich. Ct. App. 1971)......................................................28, 30

*Anderson v. Edward D. Jones & Co., L.P.*,
  990 F.3d 692, 2021 U.S. App. LEXIS 6303 (9th Cir. Mar. 4, 2021)................22

*Argabright v. Rheem Mfg. Co.*,
  201 F. Supp. 3d 578 (D.N.J. 2016)..............................................................31, 48

*Asghari v. Volkswagen Grp. of Am., Inc.*,
  42 F. Supp. 3d 1306 (C.D. Cal. 2013)........................................................35, 40

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009)..........................................................................................22

*Austin v. Univ. of Or.*,
  925 F.3d 1133 (9th Cir. 2019) .........................................................................22

*Baranco v. Ford Motor Co.*,
  294 F. Supp. 3d 950 (N.D. Cal. 2018)........................................................35, 41

*Bayliner Marine Corp. v. Crow*,
  509 S.E.2d 499 (Va. 1999) ...............................................................................29

*Benkle v. Ford Motor Co.*,
  2017 U.S. Dist. LEXIS 222317 (C.D. Cal. Dec. 22, 2017)..............................45

*Bosway Tube & Steel Corp. v. McKay Mach. Co.*,
  237 N.W.2d 488 (Mich. Ct. App. 1975)...........................................................48

*In re Carrier IQ, Inc., Consumer Privacy Litig.*,
  78 F. Supp. 3d 1051 (N.D. Cal. 2015)..............................................................36

*Cholakyan v. Mercedes-Benz USA, LLC*,
    796 F. Supp. 2d 1220 (C.D. Cal. 2011) .............................................................31

*Clemens v. DaimlerChrysler Corp.*,
    534 F.3d 1017 (9th Cir. 2008) ............................................................................51

*Comput. Network, Inc. v. AM Gen. Corp.*,
    696 N.W.2d 49 (Mich. Ct. App. 2005)..........................................................34, 39

*Cty. of Westchester v. Gen. Motors Corp.*,
    555 F. Supp. 290 (S.D.N.Y. 1983) ....................................................................37

*Cunningham v. Ford Motor Co.*,
    2015 U.S. Dist. LEXIS 198138 (S.D. Cal. Dec. 7, 2015) ..................................51

*Electrojet Inc. v. Irbit Motorworks of Am.*,
    2020 U.S. Dist. LEXIS 112269 (E.D. Mich. Apr. 9, 2020) ..............................48

*Falco v. Nissan N. Am. Inc.*,
    2016 U.S. Dist. LEXIS 46115 (C.D. Cal. Apr. 5, 2016) ...................................35

*Farley v. Country Coach, Inc.*,
    2006 U.S. Dist. LEXIS 95728 (E.D. Mich. Nov. 14, 2006).............................50

*Fiorito Bros., Inc. v. Fruehauf Corp.*,
    747 F.2d 1309 (9th Cir. 1984) ..........................................................................48

*Firm, PC v. Jaguar Land Rover N. Am., LLC*,
    894 N.W.2d 700 (Mich. Ct. App. 2016)............................................................44

*Fleisher v. Fiber Composites, LLC*,
    2012 U.S. Dist. LEXIS 157343 (E.D. Pa. Nov. 2, 2012) ..................................37

*Forjas Y Macquinados, S.A. De C.V. v. Mectron Eng'g Co.*,
    2019 U.S. Dist. LEXIS 21535 (E.D. Mich. Feb. 11, 2019)...............................50

*Francis v. GM, LLC*,
    2020 U.S. Dist. LEXIS 224356 (E.D. Mich. Nov. 30, 2020)............................28

*Frantz v. Cantrell*,
    711 N.E.2d 856 (Ind. Ct. App. 1999) ................................................................37

*In re GM LLC CP4 Fuel Pump Litig.*,
    393 F. Supp. 3d 871 (N.D. Cal. 2019) ................................................................40

*In re GMC*,
    2005 U.S. Dist. LEXIS 23259 (W.D. Okla. Aug. 8, 2005) ..............................29

*Gomez v. Mercedes-Benz USA, LLC*,
    2018 Mich. App. LEXIS 314 (Mich. Ct. App. Feb. 20, 2018)
    (unpublished) ..........................................................................................49

*Gorman v. Am. Honda Motor Co.*,
    839 N.W.2d 223 (Mich. Ct. App. 2013) ............................................................30

*Grassi v. Int'l Comfort Prods., LLC*,
    2015 U.S. Dist. LEXIS 107467 (E.D. Cal. Aug. 13, 2015) .........................38, 39

*Great Lakes Exteriors, Inc. v. Dryvit Sys. Can. Ltd.*,
    2002 U.S. Dist. LEXIS 28270 (E.D. Mich. Sept. 12, 2002) ...........................29

*Gregorio v. Ford Motor Co.*,
    2021 U.S. Dist. LEXIS 37410 (E.D. Mich. Mar. 1, 2021) ...............................25

*Guaranteed Constr. Co. v. Gold Bond Prods.*,
    395 N.W.2d 332 (Mich. Ct. App. 1986) ............................................................34

*Hastings Mut. Ins. Co. v. Safety King Inc.*,
    778 N.W.2d 275 (Mich. Ct. App. 2009) ............................................................45

*Heber v. Toyota Motor Sales, U.S.A., Inc.*,
    823 F. App'x 512 (9th Cir. 2020) (unpublished) ..............................................34

*Hindsman v. GM LLC*,
    2018 U.S. Dist. LEXIS 92319 (N.D. Cal. June 1, 2018) ..................................47

*Hinojos v. Kohl's Corp.*,
    718 F.3d 1098 (9th Cir. 2013) ...........................................................................23

*Hodges v. Johnson*,
    199 P.3d 1251 (Kan. 2009) ................................................................................38

*Isip v. Mercedes-Benz USA, LLC*,
    65 Cal.Rptr.3d 695 (Cal. Ct. App. 2007) ..........................................................37

*Jellison v. Fleetwood Enters.*,
  2004 U.S. Dist. LEXIS 28835 (E.D. Mich. Apr. 7, 2004) ................................47

*Jenkins v. U.S.A. Foods*,
  912 F. Supp. 969 (E.D. Mich. 1996) ..................................................26

*Keegan v. Am. Honda Motor Co.*,
  284 F.R.D. 504 (C.D. Cal. 2012)......................................................46

*Kelynack v. Yamaha Motor Corp.*,
  394 N.W.2d 17 (Mich. Ct. App. 1986)..............................................47

*Latimer v. William Mueller & Son, Inc.*,
  386 N.W.2d 618 (Mich. Ct. App. 1986)...............................28, 30, 48

*Leisure Sys. v. Roundup LLC*,
  2012 U.S. Dist. LEXIS 155948 (S.D. Ohio Oct. 31, 2012) .............................26

*Lessin v. Ford Motor Co.*,
  2020 U.S. Dist. LEXIS 208357 (S.D. Cal. Nov. 5, 2020).................................25

*Livingston v. Trane Inc.*,
  2019 U.S. Dist. LEXIS 15497 (D.N.J. Jan. 31, 2019)...............................*passim*

*Lohr v. Nissan N. Am., Inc.*,
  2017 U.S. Dist. LEXIS 38934 (W.D. Wash. Mar. 17, 2017)...........................51

*McKee v. GM LLC*,
  376 F. Supp. 3d 751 (E.D. Mich. 2019) ..........................................45

*Milgard Tempering v. Selas Corp. of Am.*,
  902 F.2d 703 (9th Cir. 1990) .......................................................49

*Mocek v. Alfa Leisure, Inc.*,
  7 Cal. Rptr. 3d 546 (Cal. Ct. App. 2003).........................................35

*In re MyFord Touch Consumer Litig.*,
  46 F. Supp. 3d 936 (N.D. Cal. 2014)...............................................48

*Naffe v. Frey*,
  789 F.3d 1030 (9th Cir. 2015) ......................................................22

*Norcia v. Samsung Telcoms. Am., LLC*,
  845 F.3d 1279 (9th Cir. 2017) ............................................................................26

*Oddo v. Arcoaire Air Conditioning & Heating*,
  2017 U.S. Dist. LEXIS 10507 (C.D. Cal. Jan. 24, 2017) ...........................*passim*

*Oddo v. Arcoaire Air Conditioning & Heating*,
  2017 U.S. Dist. LEXIS 129152 (C.D. Cal. Aug. 14, 2017) ........................17, 18

*Oddo v. Arcoaire Air Conditioning & Heating*,
  No. 20-80084, 2020 U.S. App. LEXIS 29823 (9th Cir. Sept. 17, 2020) ............................................................................................................17

*Pearson & Son Excavating Co. v. W. Rec. Vehicles, Inc.*,
  2005 U.S. Dist. LEXIS 47484 (E.D. Mich. Dec. 28, 2005) ........................44, 45

*Quality Air Servs., LLC v. Milwaukee Valve Co.*,
  671 F. Supp. 2d 36 (D.D.C. 2009) ......................................................................32

*Reinhardt v. Bennett*,
  205 N.W.2d 847 (Mich. Ct. App. 1973) ..............................................................25

*Roberts v. Electrolux Home Prods.*,
  2013 U.S. Dist. LEXIS 185488 (C.D. Cal. Mar. 4, 2013)...................................34

*Robinson v. Freightliner, LLC*,
  2010 U.S. Dist. LEXIS 22266 (M.D. Pa. Mar. 10, 2010) ..................................35

*Robinson v. Freightliner, LLC*,
  2010 U.S. Dist. LEXIS 22291 (M.D. Pa. Mar. 10, 2010) ..................................41

*Rodgers v. JP Morgan Chase Bank NA*,
  890 N.W.2d 381 (Mich. Ct. App. 2016)..............................................................26

*Salas v. Toyota Motor Sales, U.S.A., Inc.*,
  2016 U.S. Dist. LEXIS 195222 (C.D. Cal. Sept. 27, 2016) ...............................37

*In re Saturn L-Series Timing Chain Prods. Liab. Litig.*,
  2008 U.S. Dist. LEXIS 109978 (D. Neb. Nov. 7, 2008).......................31, 35, 40

*Schultz v. Gen. R.V. Ctr.*,
  2006 U.S. Dist. LEXIS 63414 (E.D. Mich. Sept. 6, 2006) ................................30

*Siriano v. Goodman Mfg. Co.*,
    2015 U.S. Dist. LEXIS 191458 (S.D. Ohio Aug. 18, 2015) ........................32, 39

*Spirit Aerosystems, Inc. v. SPS Techs., LLC*,
    2013 U.S. Dist. LEXIS 168696 (D. Kan. Nov. 27, 2013)...................................41

*State-William P'ship v. Gale*,
    425 N.W.2d 756 (Mich. Ct. App. 1988).............................................................25

*Stearns v. Select Comfort Retail Corp.*,
    2009 U.S. Dist. LEXIS 48367 (N.D. Cal. June 5, 2009)...................................36

*Stockinger v. Toyota Motor Sales USA, Inc.*,
    2017 U.S. Dist. LEXIS 224071 (C.D. Cal. July 7, 2017)...................................37

*Sumer v. Carrier Corp.*,
    2015 U.S. Dist. LEXIS 20731 (N.D. Cal. Feb. 20, 2015)............................38, 39

*T.J. McDermott Transp. Co. v. Cummins, Inc.*,
    2015 U.S. Dist. LEXIS 29678 (D.N.J. Mar. 11, 2015) .....................................46

*Terrell v. R & A Mfg. Partners, Ltd.*,
    835 So. 2d 216 (Ala. Civ. App. 2002) ..............................................................36

*In re Toyota Motor Corp. Unintended Acceleration Marketing, Sales*
    *Practices, & Prods. Liab. Litig.*,
    754 F. Supp. 2d 1145 (C.D. Cal. Nov. 30, 2010) .............................................45

*UAW-GM Human Res. Ctr. v. KSL Rec. Corp.*,
    579 N.W.2d 411 (Mich. Ct. App. 1998).............................................................44

*United Food Grp. v. Cargill, Inc.*,
    2014 U.S. Dist. LEXIS 204272 (C.D. Cal. Feb. 14, 2014) ...............................25

*Vanalstine v. Land O'Lakes Purina Feeds, LLC*,
    929 N.W.2d 789 (Mich. Ct. App. 2018).............................................................29

*Williams v. United Techs. Corp.*,
    2015 U.S. Dist. LEXIS 159814 (W.D. Mo. Nov. 30, 2015) .......................39, 40

*Wozniak v. Ford Motor Co.*,
    2019 U.S. Dist. LEXIS 1339 (E.D. Mich. Jan. 4, 2019) ...................................50

ix

## Statutes

15 U.S.C. §§ 2301–2312 ....................................................................3

15 U.S.C. § 2310(d)(1) .....................................................................51

15 U.S.C. § 2310(e) .....................................................................24, 51

28 U.S.C. § 1291 ..............................................................................3

28 U.S.C. § 1331 ..............................................................................3

28 U.S.C. § 1332(d) ..........................................................................3

28 U.S.C. § 1367 ..............................................................................3

Mich. Comp. Laws § 440.2313 ....................................................26, 44

Mich. Comp. Laws § 440.2314 ..........................................................28

Mich. Comp. Laws § 440.2607 ..........................................................24

Mich. Comp. Laws § 440.2719(1) ......................................................47

## Rules

Fed. R. App. P. 4(a)(2) ......................................................................4

Fed. R. Civ. P. 23(f) .........................................................................17

Fed. R. Civ. P. 8 ...................................................................27, 40, 52

Fed. R. Civ. P. 8(a) ..........................................................................22

**INTRODUCTION**

Beginning in late 2013, Carrier Corporation ("Carrier") manufactured thousands of air conditioners contaminated with an unapproved chemical rust inhibitor. ER-024 ¶¶ 1–2; ER-044–045 ¶ 80; ER-067. The contaminant causes loss of performance and resulted in widespread acute failures because it creates sticky deposits on a precision valve that controls the cooling process, called the thermostatic expansion valve ("TXV"). ER-024 ¶ 1.

TXV failures reached a crescendo rapidly, and by August 2014 Carrier determined "conclusively" that the "root cause" of these widespread TXV failures was an "unapproved" chemical rust inhibitor applied by Carrier's compressor supplier, Emerson Climate Technologies ("Emerson"). ER-032 ¶ 28; ER-033 ¶ 30; ER044–045 ¶ 80; ER-67. Carrier promptly returned its unused compressor inventory back to Emerson, as did all other manufacturers who purchased them. ER-037 ¶ 53. The rust inhibitor was universally objectionable in the trade. But Carrier nevertheless elected to continue to sell its entire inventory of contaminated air conditioners to the public, never disclosing the defect to consumers. *Id.*

Carrier's limited express warranty covers parts only; it does not cover the full costs of repairing the defect, such as labor costs. ER-025 ¶ 3. Plaintiff-Appellant, Nicholas Shoner ("Shoner"), paid hundreds of dollars to repair his

defective air conditioner twice in two years, well-within the five-year warranty period. ER-040 ¶¶ 63–64.

Further, because removing the rust inhibitor requires replacing many parts, including the costly compressor, Carrier ignored even its parts-only warranty obligation and, instead, advised service personnel to inject failed air conditioners with a highly acidic additive called A/C Re-New. ER-025 ¶ 4; ER-034 ¶ 33. Although this highly acidic additive can dissolve the sticky deposits on the TXV, it causes serious internal damage to the air conditioner. ER-034–037 ¶¶ 33, 36–50. Carrier knew but never disclosed this. ER-037 ¶ 51.

The district court erred in dismissing Shoner's claims for breach of the implied warranty of merchantability and breach of express warranty based solely on the ground that Shoner's air conditioner was currently functioning after injection with A/C Re-New. The mere fact that his air conditioner was functioning is not legally dispositive of his claims.

That his air conditioner was functioning does not mean Shoner's pre-suit demand that Carrier provide at least the parts necessary to remove the contaminants was not sufficiently "specific," as the district court illogically held.

That his air conditioner was functioning after injection of A/C Re-New also does not mean Shoner's air conditioner was merchantable at the time of sale. It was

not merchantable because the rust inhibitor is universally objectionable in the trade and results in performance loss and failures.

That Shoner's air conditioner was functioning after injection with A/C Re-New also does not mean Carrier complied with its express warranty. No reading of the warranty allows Carrier to inject a harmful additive, nor does injecting A/C Re-New actually resolve the underlying defect.

Finally, because Shoner adequately pleads state law breach of implied and express warranty claims, the district court erred in dismissing his Magnuson-Moss Warranty Act ("MMWA") claims.

## JURISDICTIONAL STATEMENT

The district court had subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331, because Shoner asserts claims under the MMWA, 15 U.S.C. §§ 2301–2312. ER-026 ¶ 7. The district court also had jurisdiction pursuant to the Class Action Fairness Act (28 U.S.C. § 1332(d)), because Shoner asserts claims on behalf of more than 100 class members, there is an aggregate amount in controversy exceeding $5,000,000, and Shoner and Carrier are citizens of different states. *Id.* The district court also had supplemental jurisdiction over Shoner's state law claims pursuant to 28 U.S.C. § 1367. *Id.*

This Court has jurisdiction pursuant to 28 U.S.C. § 1291 because Shoner appeals from a final judgment entered March 2, 2021, into which the district

3

court's October 22, 2018 Order dismissing of all of Shoner's claims merged. ER-003–004; ER-005–018. Shoner filed his notice of appeal on December 15, 2020, which, pursuant to Federal Rule of Appellate Procedure 4(a)(2), was deemed filed on the date of and after entry of the judgment. ER-075–079.

## ISSUES PRESENTED

1.     Did the district court err in dismissing Shoner's warranty claims based on its holding that his written, pre-suit notice of claims and demand that Carrier "replace the defective HVAC systems or fully remove the defective, unapproved rust inhibitor from his HVAC system," was not a sufficiently "specific" request for replacement or repair?

2.     Did the district court err in dismissing Shoner's breach of implied warranty of merchantability claim based solely on the fact that his air conditioner was currently functioning after it was injected with a highly acidic, harmful additive?

3.     Did the district court err in dismissing Shoner's breach of express warranty claim based solely on the fact that his air conditioner was currently functioning after it was injected with a highly acidic, harmful additive, even though it still contained the original defect and injecting harmful additives does not comply with Carrier's warranty obligation to provide replacement parts?

4.     Did the district court err in dismissing Shoner's claims under the

MMWA based on its erroneous dismissals of Shoner's state law breach of implied

and express warranty claims?

## STATUTORY AUTHORITIES

All relevant statutory authorities appear in the Addendum to this brief.

## STATEMENT OF THE CASE

**A.     <u>Statement of the Facts</u>**

(1) *Background Information*

At a basic level, air conditioning works by changing the pressure of

refrigerant at different locations in the system. ER-027 ¶ 9. A basic law of

thermodynamics is that temperature increases with pressure and drops when

pressure is released. *See* ER-027–028 ¶¶ 10–11; ER-031 ¶ 23. The compressor and

the TXV are responsible for changing the pressure of the refrigerant. *See* ER-027 ¶

9; ER-028 ¶ 11; ER-031 ¶¶ 23–25.

In a typical central air conditioning system, the air conditioner, technically

called the "condenser," sits outside the home. ER-027 ¶ 9. In the condenser, the

compressor pressurizes the refrigerant, which changes it from a gas to a hot liquid.

ER-027–028 ¶¶ 9–10. The compressor moves the hot, liquid refrigerant through the

condenser "coil," which is a coil of copper or aluminum tubing with fins to radiate

5

heat. ER-027–028 ¶ 10. A fan in the middle of the coil cools the hot, pressurized refrigerant. *Id.*

The pressurized refrigerant then travels through a copper pipe from the outdoor condenser to an indoor coil, which is connected to ductwork inside the home. *See* ER-028 ¶ 11. At the indoor coil, the TXV precisely releases the pressurized refrigerant into the coil. *Id.*; ER-031 ¶¶ 24–25. As the pressure is released, the liquid refrigerant changes to a gas, which results in a significant drop in the refrigerant's temperature as it enters the coil. ER-028 ¶ 11; ER-31 ¶¶ 23–25. A fan then circulates household air over the cold coil and through the ductwork, which cools the home. *See* ER-028 ¶ 11.

The gaseous refrigerant then leaves the indoor coil and travels back to the compressor in the condenser where the process begins again. *Id.*

Modern air conditioning systems rely on TXVs in order to meet energy efficiency regulations. ER-031 ¶ 24. The TXV precisely controls the release of the pressure and flow of refrigerant into the indoor coil with a small, moveable pin. ER-031 ¶ 25. If contaminants collect on the TXV pin, the contaminant interferes with the performance and efficiency of the air conditioner and can also cause an acute failure. ER-024 ¶ 1; ER-025–026 ¶ 5; ER-031 ¶ 25.

The compressor is the "heart" of the air conditioner; it compresses the refrigerant and circulates it through the system. *See* ER-027–028 ¶¶ 10–11. The

compressor contains oil that washes over the compressor motor during operation to ensure lubrication. ER-028 ¶ 12. A small amount of the oil from the compressor also circulates through the system with the refrigerant, thereby providing lubrication for the moving parts within the system. *Id.*

(2) *The Unapproved Rust Inhibitor and Carrier's Actions*

Carrier, like many major air conditioner manufacturers, acquires compressors for its air conditioners from Emerson.[1] *See* ER-024 ¶ 1; ER-031–032 ¶ 26. Carrier and Emerson were well-aware prior to 2013 that process chemicals, such as rust inhibitors, can react with the oil that circulates in an air conditioner and lead to TXV clogs. ER-030 ¶ 20; ER-031 ¶ 25.

In late 2013, Emerson began applying the rust inhibitor at issue here, called Ryconox, to the motors of its compressors during the manufacturing process. ER-032 ¶ 27. The rust inhibitor serves no purpose in the compressor. *Id.* Rather, the sole purpose was to prevent rust from forming on the parts during the manufacturing process. *Id.* Because oil washes over the compressor motor during operation, and some of the oil travels with the refrigerant through the system, some of the rust inhibitor mixes with the oil and gradually spreads through the entire

---

[1] Carrier manufactures air conditioners using numerous trade names, including Carrier, Bryant, Payne, Arcoaire, and others. For convenience, we use the term Carrier to refer to all Carrier-manufactured air conditioners regardless of brand name.

system. ER-028 ¶ 12. When the rust inhibitor reaches the TXV, where the refrigerant evaporates from a liquid to a gas, the rust inhibitor forms sticky deposits on the TXV pin, interfering with the efficiency and operation of the TXV. ER-025–026 ¶ 5; ER-031 ¶ 25.

Soon after Emerson began using the unapproved rust inhibitor, Carrier and other manufacturers began receiving a flood of complaints that brand-new air conditioners were failing within weeks of installation due to stuck TXVs. ER-027–028 ¶ 10; ER-032 ¶ 28. By at least June 2014, the complaints had reached a crescendo, and testing showed that a chemical reaction was causing sticky deposits on the TXV. ER-032 ¶ 28.

By no later than August 2014, Carrier determined "conclusively that the root cause of the TXV contamination [was the] rust inhibitor . . . ." ER-033 ¶ 30.

After they discovered the root cause, Carrier and other manufacturers returned their inventory of unused compressors containing the rust inhibitor back to Emerson. ER-037 ¶ 53. Clearly, the presence of the rust inhibitor did not "pass without objection in the trade." ER-038 ¶ 55.

But, while Carrier returned its inventory of unused compressors to Emerson, Carrier had already sold thousands of air conditioners containing the contaminant and had thousands more in its inventory, which it continued to sell knowing they were defective. ER-024–25 ¶ 2; ER-033 ¶ 31; ER-037 ¶ 53. Carrier did nothing to

repair or replace these air conditioners. *See* ER-024–025 ¶ 2; ER-037 ¶ 53. Carrier sold its entire inventory of contaminated air conditioners to the public without disclosing the defect. ER-024–025 ¶¶ 2–3; ER-033 ¶ 31.

Tens of thousands of Carrier air conditioners manufactured between late-2013 and August 2014 contain this unapproved rust inhibitor, which will impact their performance for years to come. ER-025 ¶ 3.

Carrier's warranty does not cover the full cost of repairs. ER-025 ¶ 3. Carrier's limited warranty covers parts only; it does not cover labor and other costs. ER-025 ¶¶ 3–4; ER-033–034 ¶ 32. Many consumers, like Shoner, paid hundreds or thousands of dollars on repairs within the warranty period due to the rust inhibitor. ER-039 ¶ 58; ER-040 ¶¶ 63–64.

Moreover, Carrier failed to comply even with its minimal obligations under its limited warranty. Carrier's warranty states:

> [Carrier] warrants this product against failure due to defect in materials or workmanship under normal use and maintenance as follows. . . . If a part fails due to defect during the applicable warranty period Company will provide a new or remanufactured part, at Company's option, to replace the failed defective part at no charge for the part.

ER-021.

When failures occurred, however, instead of providing replacement parts necessary to fully remove the rust-inhibitor contaminant, which would be very

costly, Carrier instructed service personnel to inject the air conditioners with the highly acidic additive, A/C Re-New.[2] ER-034 ¶ 33.

This acidic additive can dissolve sticky deposits on the TXV, but it causes serious internal damage to other parts of the air conditioner. ER-025 ¶ 4; ER-034 ¶ 33; ER-034–035 ¶ 36. A/C Re-New was never intended for use in new air conditioners but, rather, was marketed as a means to squeeze some extra life out of old air conditioners on their last legs. ER-034 ¶ 34. Ordinarily, injecting A/C Re-New into an air conditioner voids the manufacturer's warranty. ER-028 ¶ 12; ER-034 ¶ 34.

Emerson's testing of A/C Re-New found that it: (1) causes a 3600% increase in acidity—more than ten times higher than the generally accepted maximum, ER-035 ¶ 39; (2) attacks the leaded bronze bearings in the compressor, which results in a 540% increase in dissolved lead, ER-036 ¶ 42; (3) causes significant copper plating on the compressors, which is the dissolving of copper from pipes in the air conditioner and re-depositing that copper onto non-copper surfaces, ER-036 ¶¶ 43–44; (4) causes a significant increase in "hydrolysis," or chemical breakdown, of the oil in the systems, ER-036 ¶ 45; (5) causes swelling of certain non-metallic materials, such as neoprene, that are commonly used for gaskets, such as in the

---

[2] A/C Re-New is sometimes also called Zerol Ice. For ease of reference, we use A/C Re-New here.

TXV, ER-036 ¶ 46; and (6) causes damage to compressors, including abnormal drive bearing wear, abnormal bronze exposure from wear, abnormal scroll tip wear, "heavy wear" on several lower bearings, and "badly" discolored oil, ER-037 ¶¶ 47–49.

Carrier and other manufacturers recognized that A/C Re-New was unacceptable. *See* ER-037–038 ¶¶ 52–55. Emerson, after retrieving thousands of compressors contaminated with the rust inhibitor, injected them with A/C Re-New—the same "fix" that Carrier was advising service personnel to use—and tried to re-sell them back to the manufacturers. ER-034 ¶ 33; ER-037 ¶ 51; ER-038 ¶ 54. All but one of the seven largest manufacturers refused to accept them. ER-038 ¶ 54.

Notwithstanding all of the known harmful effects, Carrier instructed service personnel to inject this additive because it was cheaper than furnishing all the parts necessary to remove the rust inhibitor as required by the warranty, and Carrier never disclosed the damaging effects of A/C Re-New to either service personnel or consumers. ER-034 ¶ 33; ER-037 ¶ 51.

(3) *Shoner's Air Conditioner Failures and His Pre-Suit Demand for Replacement or Repair*

Shoner is a resident of Michigan. ER-039 ¶ 59. He purchased one of the contaminated air conditioners for his home from a Carrier distributor on June 30,

2014, and paid a local dealer, Les Pullins Mechanical, to install it on July 15, 2014. ER-039 ¶¶ 60–61.

In late summer 2015, Shoner's HVAC system failed. ER-039 ¶ 62. Carrier's warranty advises owners to contact their installer or a Carrier dealer for warranty service or repair. ER-021. Shoner contacted his installer. ER-039 ¶ 62. His installer determined that the TXV needed to be replaced. *Id.*

Shoner purchased a new TXV for $84.82 from the Carrier distributor and paid another contractor approximately $300 for labor to replace the TXV in March 2016. ER-040 ¶ 63.

Within a short time, however, the TXV failed again. ER-040 ¶ 64. In July 2016, Shoner paid a contractor between $200 and $300 to inject the additive based on Carrier's instructions. *Id.* But Carrier never disclosed that the additive causes serious internal damage, as described above. ER-034–037 ¶¶ 35–51. Thus, Shoner now has two harmful contaminants in his air conditioner. ER-040 ¶ 64.

In a section of Carrier's warranty titled "LEGAL REMEDIES," it states that thirty days prior to pursuing any legal rights or remedies, the owner must notify Carrier "in writing, by certified or registered letter . . . of any defect or complaint with the product, stating the defect or complaint and a specific request for repair, replacement, or other correction of the product under warranty . . . ." ER-021.

12

On April 25, 2018, more than thirty days prior to filing this Action, Shoner sent a letter by certified mail to Carrier's in-house counsel, warranty department, and outside counsel who represented Carrier in the related *Oddo* case, discussed below. ER-067; ER-074. On behalf of himself and other similarly situated purchasers, Shoner's pre-suit letter notified Carrier of its breaches of implied and express warranties and demanded a replacement air conditioner or all such parts as necessary to fully remove the contaminants from his system. ER-067–068; ER-072. The letter, attached to Shoner's complaint as Exhibit A, stated, *inter alia*, that: Carrier knew about the defect as early as spring 2014; all of the contaminated air conditioners are defective even if they have not yet experienced an acute TXV failure; Carrier failed to comply with implied warranties by selling defective air conditioners in an unmerchantable state; and Carrier failed to comply with express warranties because, rather than replace the defective components as necessary to remove the contaminant, Carrier advised service personnel to inject a harmful additive, which is not a proper repair and causes additional harm. *Id.*

Shoner demanded, *inter alia*, that Carrier:

Compensate Claimants and all purchasers for the full difference between what they paid and the actual value of the defective HVAC Systems; . . . Replace the defective HVAC Systems, or all such parts (including refrigerant and oil) as are necessary to fully remove all contaminates [sic]; [and] . . . Compensate Claimants and all purchasers and contractors who incurred costs and/ or labor to repair defective HVAC Systems . . . .

ER-073. Carrier did not provide any of the requested relief sought by Shoner's pre-suit notice.

**B.     Procedural History**

Shoner filed this action, along with his co-plaintiff, Paul Cormier, in the United States District Court for the District of Connecticut on June 8, 2018. ER-023–074. On July 31, 2018, the action was transferred upon Carrier's unopposed motion to transfer venue pursuant to 28 U.S.C. § 1404(a) to the Central District of California, where a related action, *Oddo v. Arcoaire Air Conditioning & Heating*, No. 15-01985 (C.D. Cal.), was pending. District Ct. Dkt. No. 17.

On October 22, 2018, the district court granted Carrier's motion to dismiss all of Shoner's claims and granted in part and denied in part Carrier's motion to dismiss plaintiff Paul Cormier's claims, allowing only Cormier's Massachusetts consumer protection claim and unjust enrichment claim to survive. ER-005–018. Subsequently, after the district court denied class certification of Cormier's claims, on November 16, 2020, Plaintiff Cormier accepted an offer of judgment from Carrier in his favor. District Ct. Dkt. Nos. 114, 116. Shoner then filed a notice of appeal on December 15, 2020. ER-075–079. The court entered final judgment on March 2, 2021. ER-003–004.

### C.     The Relevant Decisions in the Related *Oddo* Case

As already stated, soon after it was filed in June 2018, this action was transferred to the Central District of California where the related *Oddo* action had been pending since November 2015.

By that time, the *Oddo* court had already reached several dispositive legal holdings in the *Oddo* action that were subsequently adopted and applied in this Action as well. Thus, in order to elucidate the district court's holdings below, we first briefly summarize the relevant rulings in *Oddo* that were adopted in the decision below.

In *Oddo*, plaintiffs from Arizona, California, Florida, Georgia, Indiana, Maryland, and Missouri brought claims against Carrier arising out of the rust-inhibitor defect for breach of express and implied warranty, violation of the MMWA, as well as violation of their respective consumer protection statutes. *See Oddo*, 2017 U.S. Dist. LEXIS 10507, at *2–3 (C.D. Cal. Jan. 24, 2017) [hereinafter "*Oddo Mot. Dismiss Op.*"].

Relevant here, the district court dismissed the *Oddo* plaintiffs' implied and express warranty claims based on the fact that the plaintiffs' air conditioners were functional after injection with A/C Re-New.

First, the district court held that a pre-litigation notice and demand letter, sent by plaintiff Steve Oddo to Carrier, did not provide sufficient notice of

breaches of warranty because Oddo's system had "already been injected with A/C Re-New and he does not allege that his system continued to fail after that intervention." *Id.* at *23. Although Oddo alleged that A/C Re-New was harmful and injecting it did not comply with the warranty, the district court held that "[t]he possibility that A/C Re-New might cause a later malfunction is not enough to allege breach of the warranties." *Id.* at *42, 44. Moreover, the district court held that Oddo's demand letter, which demanded that Carrier "[r]eplace the defective [air conditioners], or all such parts (including refrigerant and oil) as are necessary to fully remove all contaminants," was not "a *specific* request for repair, replacement, or other correction of *the* product," as purportedly required by the terms of Carrier's warranty because his unit was currently working. *Id.* at *23–24 (emphasis original).

Second, the district court dismissed the plaintiffs' implied warranty claims because their "units are currently . . . operational," and, therefore, the "plaintiffs have failed to allege a fundamental defect that renders their [air conditioners] unfit for their ordinary purpose."[3] *Id.* at *49.

---

[3] The district court in *Oddo* allowed only certain of the plaintiffs' state law omission claims and unjust enrichment claims to go forward and subsequently denied class certification of those claims. This Court denied plaintiffs petition for interlocutory review of the class certification decision pursuant to Federal Rule of Civil Procedure 23(f). *Oddo v. Arcoaire Air Conditioning & Heating*, No. 20-80084, 2020 U.S. App. LEXIS 29823 (9th Cir. Sept. 17, 2020). The *Oddo* action remains pending in the district court.

16

On June 30, 2017, roughly sixty days after discovery opened, the plaintiffs in the *Oddo* action sought leave to file an amended complaint to reassert their dismissed warranty claims. *See Oddo v. Arcoaire Air Conditioning & Heating*, 2017 U.S. Dist. LEXIS 129152, at *3 (C.D. Cal. Aug. 14, 2017) [hereinafter, "*Oddo Leave to Amend Op.*"]. Their proposed amended complaint included further allegations about the harmful nature of A/C Re-New, as well as additional details regarding Oddo's pre-litigation communications with Carrier, which included six letters exchanged between the plaintiffs and Carrier. *See id.* at *17–24.

The district court denied leave to file an amended complaint. *Id.* at *43. Relevant here, the district court held that amendment would be futile because, notwithstanding that the proposed amended complaint included additional details about the harm caused by A/C Re-New, the plaintiffs still did not allege that their units were currently malfunctioning after the injection of A/C Re-New. *Id.* at *33–34, 42. The court reiterated its prior holdings that, absent a current malfunction, the plaintiffs could not state a claim for either implied or express warranty. *Id.*

The district court also held that amendment would be futile because the additional letters exchanged between plaintiffs and Carrier, in which the plaintiffs reiterated their demand that Carrier "[r]eplace the defective HVAC Systems, or all such parts (including refrigerant and oil) as are necessary to fully remove all

contaminants," still did not constitute sufficiently specific requests for repair. *Id.* at *30–32.

### D. The Decision Below Granting Carrier's Motion to Dismiss

Shoner's allegations are not materially different from those the district court twice held were insufficient to state a claim for breach of express or implied warranty in *Oddo*. Indeed, many of the factual allegations are identical.

Shoner's air conditioner, like Oddo's, was currently functioning after it was injected with A/C Re-New. *See* ER-040 ¶ 64. The district court held in *Oddo* that plaintiffs could not state a claim for breach of implied or express warranty if their air conditioner was currently functioning after injection with A/C Re-New. *Oddo Mot. Dismiss Op.*, 2017 U.S. Dist. LEXIS 10507, at *43, *49.

Shoner's allegations about the harm caused by A/C Re-New are also identical in all material respects to the allegations in the proposed amended complaint in *Oddo*, which the district court held were not sufficient to state a claim because the plaintiffs' air conditioners were currently operating. *Compare* ER-033–037 ¶¶ 31–50 (allegations regarding harm caused by A/C Re-New), *with Oddo Leave to Amend Op.*, 2017 U.S. Dist. LEXIS 129152, at *19.

Likewise, Shoner's pre-suit notice and demand letter contained the exact same language as the *Oddo* letter, which the district court twice held was not a sufficiently specific request for replacement or repair. Specifically, Shoner, like

18

Oddo, demanded that Carrier "[r]eplace the defective HVAC Systems, or all such parts (including refrigerant and oil) as are necessary to fully remove all contaminants" and "[c]ompensate Claimant and all purchasers and contractors who incurred costs and/or labor to repair defective systems." *Compare* ER-073, *with Oddo Mot. Dismiss Op.*, 2017 U.S. Dist. LEXIS 10507, at *8, *and Oddo Leave to Amend Op.*, 2017 U.S. Dist. LEXIS 129152, at *32.

In light of the fact the district court had already decided (twice) that no express or implied warranty claim could survive based on materially identical facts and allegations in *Oddo*, and given that this action had been transferred to the *Oddo* court, in their opposition to Carrier's Motion to Dismiss, Shoner and his co-plaintiff, Cormier, stated:

> To be clear, Plaintiffs do not concede that their express and implied warranty claims should be dismissed. However, they concede that the allegations here do not vary materially from the allegations in the related case, *Oddo v. Arcoaire Air Conditioning and Heating*, No. 8:15-cv-01985-CAS, insofar as the Plaintiffs' systems here suffered TXV failures, were injected with [A/C Re-New], and are currently functioning. . . .

ER-019. As such, Shoner conceded that the district court's rulings in *Oddo*, if followed, were dispositive here as well.

Not surprisingly, the district court followed and applied its *Oddo* decisions and dismissed all breach of express and implied warranty claims for the same

reasons it did in *Oddo*. As summarized by the district court, its holdings relevant to this appeal are:

> (1) the plaintiffs did not allege that they submitted a claim to Carrier for a *specific request* for repair under the warranty; . . . (3) the plaintiffs failed to plead that Carrier failed to satisfy its obligations under the warranty because the plaintiffs did not allege that there was any further failure or malfunction of their HVAC units after the injections of A/C Re-New. The Court also found that the plaintiffs did not state a claim for breach of implied warranty because they did not allege that the injections of A/C Re-New into their systems resulted in any actual defects.

ER-010.

The district court also dismissed Shoner's claims under the Michigan Consumer Protection Act, but Shoner does not appeal that decision. ER-015–016.

## SUMMARY OF THE ARGUMENT

The district court erred in holding that Shoner's pre-suit demand was not a sufficiently "specific request for repair" because his air conditioner was currently functioning. That his air conditioner was functioning is entirely irrelevant to whether his demand was sufficiently "specific."

The district court also erred in dismissing Shoner's claim for breach of the implied warranty of merchantability on the ground that his air conditioner was currently functioning. As the United States District Court for the District of New Jersey correctly held in a related case against Trane Inc., arising out of the same defect at issue here, the fact that an air conditioner is currently functioning does not

necessarily mean it was merchantable at the time of sale. Shoner adequately alleges that his air conditioner was unmerchantable because: (1) the rust inhibitor does not "pass without objection in the trade;" (2) air conditioners containing it are not of "average quality"; and (3) his air conditioner was not fit for its intended use because it failed twice due to the rust inhibitor within the warranty period, costing him hundreds of dollars in repairs.

The district court also erred in dismissing Shoner's breach of express warranty claim based solely on the fact that his air conditioner was working after injection of A/C Re-New. Carrier breached its express warranty, first, by selling materially defective air conditioners and then, again, by instructing service personnel to inject a harmful additive rather than replace the defective components as required by the warranty. The warranty cannot be read to authorize harmful additive injections. If it does, then the warranty has failed of its essential purpose. Once again, the District of New Jersey upheld the same claims in an identical case against Trane. The district court here erred in dismissing them.

Finally, because the MMWA provides a cause of action for a consumer who is harmed by a warrantor's failure to comply with its written or implied warranties, the district court erred in dismissing the MMWA claim based on its erroneous dismissals of the state law warranty claims.

## STANDARD OF REVIEW

This Court reviews a district court's decision granting a motion to dismiss *de novo*. *Anderson v. Edward D. Jones & Co., L.P.*, 990 F.3d 692, 2021 U.S. App. LEXIS 6303, at \*10 (9th Cir. Mar. 4, 2021) (quoting *Northstar Fin. Advisors, Inc. v. Schwab Invs.*, 904 F.3d 821, 828 (9th Cir. 2018)).

This Court, like the district court, must "accept factual allegations in the complaint as true and construe the pleadings in the light most favorable to the nonmoving party." *Id.*

"It is well established that, under Rule 8(a), a plaintiff need only provide 'enough facts to state a claim to relief that is plausible on its face.'" *Austin v. Univ. of Or.*, 925 F.3d 1133, 1137 (9th Cir. 2019) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). And a "claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Thus, "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Naffe v. Frey*, 789 F.3d 1030, 1035 (9th Cir. 2015) (quoting *Iqbal*, 556 U.S. at 678).

Because courts accept well-plead allegations as true, the district court and this Court should not typically decide questions of fact at the motion to dismiss

stage. *See, e.g., Hinojos v. Kohl's Corp.*, 718 F.3d 1098, 1107 n.7 (9th Cir. 2013) (noting that when a claim presents "an issue of fact, [it] therefore should not be decided at the motion to dismiss stage").

## ARGUMENT

I. <u>The district court erred in holding that Shoner's pre-suit demand letter was not sufficiently specific merely because his air conditioner was functioning after injection with A/C Re-New.</u>

The district court erred in holding at the motion to dismiss stage that Shoner's demand letter was not a sufficiently "*specific request* for repair under the warranty." ER-010 (emphasis in original). Shoner's demand was perfectly specific—it demanded replacement of his air-conditioner system or all parts necessary to remove all contaminants. ER-072. The fact that his system was operating at the time of his demand, after having been injected with harmful A/C Re-New, does not make his demand for repair or replacement insufficiently specific. Moreover, whether his demand was specific enough to meet a contractual provision of the warranty is a question of fact that cannot be decided on a motion to dismiss.

Neither the UCC nor the MMWA requires a "specific request for repair" prior to bringing a claim for breach of the implied warranty of merchantability or breach of express warranty. Instead, a plaintiff need only provide pre-suit notice sufficient to alert a defendant of its breach, open channels of negotiation, and

provide defendant an opportunity to cure. *See, e.g.*, 15 U.S.C. § 2310(e); Mich. Comp. Laws § 440.2607; *Am. Bumper & Mfg. Co. v. Transtechnology Corp.*, 652 N.W.2d 252, 256 (Mich. Ct. App. 2002).

In *Livingston v. Trane Inc.*, 2019 U.S. Dist. LEXIS 15497, at *28–33 (D.N.J. Jan. 31, 2019), a related case against Trane Inc. arising out of the same same rust-inhibitor defect at issue here, the court held that a demand letter identical in material respects to Shoner's was a valid warranty claim and satisfied all notice requirements under the MMWA and UCC. *Id.* at *29–33,41–43, 48, 52, 56.

The district court here did not hold otherwise as to the MMWA or UCC. Instead, the court's decision relied on the "LEGAL REMEDIES" provision in Carrier's express warranty, which purports to require a registered letter "stating the defect or complaint and a specific request for repair, replacement, or other correction of the product under warranty, mailed at least thirty (30) days before pursuing any legal rights or remedies." ER-010; ER-021; *Oddo Mot. Dismiss Op.*, 2017 U.S. Dist. LEXIS 10507, at *22–24.

Clearly, Shoner *did* send a demand for replacement or repair to Carrier's in-house counsel, outside counsel, and warranty department by certified mail more than thirty days prior to initiating his legal action. ER-040–041 ¶ 66; ER-067; ER-074. His demand letter identified the defect and demanded replacement of the entire contaminated air conditioning system or all such parts as necessary to fully

24

remove all contaminants, including the rust inhibitor and A/C Re-New. ER-072. Whether that demand was sufficiently "specific" is a quintessential question of fact, and the fact that his air conditioner was functioning makes his demand neither more nor less specific.

Courts almost universally hold that whether a pre-suit notice is sufficient to meet obligations under the UCC and MMWA is a question of fact. *See, e.g.*, *Gregorio v. Ford Motor Co.*, 2021 U.S. Dist. LEXIS 37410, at *36 (E.D. Mich. Mar. 1, 2021) ("[S]ufficiency of the notice [is a] question[ ] of fact"); *Lessin v. Ford Motor Co.*, 2020 U.S. Dist. LEXIS 208357, at *16 (S.D. Cal. Nov. 5, 2020) (collecting cases from multiple jurisdictions); *United Food Grp. v. Cargill, Inc.*, 2014 U.S. Dist. LEXIS 204272, at *12 (C.D. Cal. Feb. 14, 2014) (collecting cases from multiple jurisdictions); *see also Reinhardt v. Bennett*, 205 N.W.2d 847, 851–52 (Mich. Ct. App. 1973) (reversing trial court's dismissal for failure to state a claim where a factual dispute existed as to "whether the plaintiffs gave or were required to give the defendant written notice of any defects in the pool").

Likewise, whether Shoner's letter was specific enough to meet a contractual obligation under the warranty is a question of fact, judged under a substantial compliance standard under Michigan law. *See, e.g.*, *State-William P'ship v. Gale*, 425 N.W.2d 756, 760 (Mich. Ct. App. 1988) (compliance with contract is a question of fact); *Rodgers v. JP Morgan Chase Bank NA*, 890 N.W.2d 381, 386

(Mich. Ct. App. 2016) (contract performance is subject to substantial compliance standard); *Jenkins v. U.S.A. Foods*, 912 F. Supp. 969, 974 (E.D. Mich. 1996) ("[U]nder Michigan jurisprudence, whether a contract has been substantially performed . . . is a question of fact for the trier of fact."); *see also Leisure Sys. v. Roundup LLC*, 2012 U.S. Dist. LEXIS 155948, *23 (S.D. Ohio Oct. 31, 2012) (citation omitted) (applying substantial performance standard and noting that "[w]here there is evidence of actual notice, a technical deviation from a contractual notice requirement will not bar the action for breach of contract brought against a party that had actual notice.").[4]

As explained in the sections below, as a substantive matter, the district court erred in holding that Shoner could not state a claim for breach of implied or express warranty so long as his air conditioner was currently functioning. Even if that were true, however, it would not be a basis to hold that his pre-suit notice was inadequate. The functional status of his air conditioner is wholly irrelevant to whether his letter provided adequate notice. The district court erred in holding on a motion to dismiss

---

[4] Indeed, whether Shoner was bound by the notice requirement at all is a question of fact. *See Norcia v. Samsung Telcoms. Am., LLC*, 845 F.3d 1279, 1288 (9th Cir. 2017) ("Language in a written warranty agreement is 'contractual' in the sense that it creates binding, legal obligations on the seller, . . . but a warranty does not impose binding obligations on the buyer."); *cf.* Mich. Comp. Laws § 440.2313 (emphasis added) (stating a warranty is "an affirmation of fact or promise *made by the seller* to the buyer which relates to the goods . . . .").

that Shoner's demand was not a sufficiently "specific request" for replacement or repair.

## II.  **The district court erred in dismissing Shoner's implied warranty claim.**

The district court also erred in dismissing Shoner's claim for breach of the implied warranty on the ground that his air conditioner was currently functioning after he spent hundreds of dollars on repairs and after injection of A/C Re-New. To be merchantable, a product must at least pass without objection in the trade, be of average quality, and be fit for its intended use at the time of sale. As the district court in *Livingston* held when it allowed the same claims to go forward against Trane, a product can be unmerchantable at the time of sale even if it functions for several years thereafter. 2019 U.S. Dist. LEXIS 15497, at *38.

### A.  **Shoner adequately pleads a claim for breach of implied warranty under Rule 8 pleading standards.**

Initially, Shoner adequately alleges the elements of an implied warranty claim. Michigan has adopted Section 2-314 of the UCC, which states that, "[u]nless excluded or modified (section 2316), a warranty that the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind."[5] Mich. Comp. Laws § 440.2314.

---

[5] "Under Michigan law, plaintiffs are not required to allege privity to successfully state a claim for breach of the implied warranty of merchantability." *Francis v. GM, LLC*, 2020 U.S. Dist. LEXIS 224356, at *32 (E.D. Mich. Nov. 30, 2020) (citations omitted). In any event, however, Shoner alleges contractual privity with

To be merchantable, the good must at least: "(a) pass without objection in the trade under the contract description; and (b) in the case of fungible goods, [be] of fair average quality within the description; and (c) [be] fit for the ordinary purposes for which such goods are used . . . ." *Id*.

### 1.   The rust inhibitor is objectionable in the trade.

First, Shoner sufficiently alleges that the rust inhibitor was objectionable to commercial participants in the trade, which alone is enough to state a claim for breach of implied warranty. *See, e.g.*, *Latimer v. William Mueller & Son, Inc.*, 386 N.W.2d 618, 623–24 (Mich. Ct. App. 1986) (affirming judgment for breach of implied warranty where seed was contaminated with abnormal level of disease, which was unacceptable in the trade); *Ambassador Steel Co. v. Ewald Steel Co.*, 190 N.W.2d 275, 279 (Mich. Ct. App. 1971) (affirming judgment in plaintiff's favor where steel was not the standard quality considered acceptable in the trade).

Shoner alleges that Carrier and other manufacturers objected to the presence of the rust inhibitor based on the fact that, after they discovered that the unapproved rust inhibitor was the root cause of industry-wide TXV failures in the summer of 2014, they returned their entire inventories of contaminated compressors back to Emerson. ER-033 ¶ 30; ER-037 ¶ 53. Then, after Emerson

---

Carrier through the express limited warranty, which limits the implied warranty of merchantability to the duration of the express warranty but does not disclaim it. ER-022.

remediated the compressors with A/C Re-New, nearly all manufacturers *still* refused to accept them. ER-038 ¶ 54. These factual allegations are sufficient to allege that the presence of the rust inhibitor, and the subsequent injection of A/C Re-New, was objectionable in the trade. Indeed, it was objectionable to Carrier itself. *Cf. Great Lakes Exteriors, Inc. v. Dryvit Sys. Can. Ltd.*, 2002 U.S. Dist. LEXIS 28270, at *11 (E.D. Mich. Sept. 12, 2002) ("[I]f [a supplier] must rework [the product] in order to be able to resell it, then by definition that [product] is not merchantable until it is reworked.").

Courts applying the UCC have also held that a product does not pass without objection in the trade if a significant portion of consumers would object to the defect. *See, e.g.*, *In re GMC*, 2005 U.S. Dist. LEXIS 23259, at *8–9 (W.D. Okla. Aug. 8, 2005); *Bayliner Marine Corp. v. Crow*, 509 S.E.2d 499, 503 (Va. 1999).[6] Shoner alleges that, "[h]ad Carrier disclosed this known contaminant, [he and other] consumers would not have purchased the defective HVAC systems . . . ." ER-033 ¶ 31. This too is sufficient to state a claim based on the contaminant being objectionable in the trade.

---

[6] In applying Michigan's UCC, courts may look to "guidance from decisions of other jurisdictions interpreting similar model provisions." *Vanalstine v. Land O'Lakes Purina Feeds, LLC*, 929 N.W.2d 789, 796 (Mich. Ct. App. 2018).

2. <u>Air conditioners containing the rust inhibitor are not of fair or average quality.</u>

Second, Shoner alleges that the contaminated air conditioners are not of "fair or average quality" relative to non-contaminated air conditioners within the industry because the rust inhibitor causes sticky deposits on the TXV, which impacts performance and causes widespread failures. ER-024 ¶ 1; ER-025–026 ¶ 5; ER-031 ¶ 25; ER-032 ¶ 28.

Merchantable does not mean perfect, but it does require that the goods be of average quality within the industry. *Schultz v. Gen. R.V. Ctr.*, 2006 U.S. Dist. LEXIS 63414, at *31-32 (E.D. Mich. Sept. 6, 2006); *Gorman v. Am. Honda Motor Co.*, 839 N.W.2d 223, 228 (Mich. Ct. App. 2013). The implied warranty may be breached by selling a product that is a "different quality than ordinarily sold" in the industry. *Ambassador Steel Co.*, 190 N.W.2d at 279; *see also Latimer*, 386 N.W.2d at 623–24 (seed had abnormal amount of disease).

Here, Carrier admitted internally that the rust inhibitor was "unapproved" for use in its air conditioners and that it was the "root cause" of widespread TXV failures. ER-033 ¶ 30; ER-044–045 ¶ 80; ER-067. Thus—by Carrier's own standards—the contaminated air conditioners were not of standard or average quality. These allegations are also sufficient to state a claim.

30

3.  <u>Shoner's air conditioner was not fit for ordinary use at the time of sale.</u>

Third, in addition to all the above, Shoner alleges that his air conditioner was not fit for ordinary use at the time of sale because it failed and required costly repairs twice within the first two years of ownership—both times within the warranty period—due to the manufacturing defect. ER-039–040 ¶¶ 62–64. Moreover, it still contains the objectionable rust inhibitor, and, as a result of Carrier's instructions, it now also contains a highly acidic additive known to cause significant additional damage. ER-033–037 ¶¶ 32–51; ER-040 ¶ 64.

This too is sufficient to state a prima facie claim for breach of the implied warranty of merchantability. *See, e.g.*, *In re Saturn L-Series Timing Chain Prods. Liab. Litig.*, 2008 U.S. Dist. LEXIS 109978, at \*32–34 (D. Neb. Nov. 7, 2008) (applying Michigan law and holding that a single failure, for which the plaintiff paid for a repair, was sufficient to state a prima facie claim); *Argabright v. Rheem Mfg. Co.*, 201 F. Supp. 3d 578, 598–99 (D.N.J. 2016) (finding a plausible claim for breach of the implied warranty of merchantability when plaintiffs air conditioners failed well within the warranty period, which "raises an inference that the expected useful life of the Defendant's product had not been exhausted when it stopped working"); *Cholakyan v. Mercedes-Benz USA, LLC*, 796 F. Supp. 2d 1220, 1244 (C.D. Cal. 2011) ("Vehicles subject to engine failure cannot be said to be merchantable."); *Siriano v. Goodman Mfg. Co.*, 2015 U.S. Dist. LEXIS 191458, at

31

*37–38 (S.D. Ohio Aug. 18, 2015) (finding plausible claim for breach of implied warranty of merchantability where plaintiff alleged that air conditioners were "incapable of performing their intended function" because their coils "were too thin and made of insufficient quality, causing premature corrosion, holes, cracks, and significant damage to the unit as a whole"); *Quality Air Servs., LLC v. Milwaukee Valve Co.*, 671 F. Supp. 2d 36, 46 (D.D.C. 2009) (denying summary judgment on breach of the implied warranty of merchantability claim where HVAC valves were "unfit for their ordinary purpose of carrying water under high pressure at high temperatures" because they were "time bomb[s]" that would fail significantly before their "expected service life").

For all of the above reasons, Shoner adequately alleged that contaminated air conditioners were unmerchantable at the time of sale.

**B.     The district court erred in holding that Shoner could not state a claim merely because his air conditioner was working at the time of the complaint.**

The district court here all but ignored the allegations that the contaminated air conditioners do not pass without objection in the trade and are not of average quality. Instead, it focused on the "fitness" prong and concluded that, because the air conditioners were operational after injection of A/C Re-New, there was no breach of implied warranty. Stated succinctly, the district court held:

[P]laintiffs do not allege at all that their units are currently not operational. The Court therefore concludes that plaintiffs have failed to

32

allege a fundamental defect that renders their HVAC systems unfit for their ordinary purpose.

*Oddo Mot. Dismiss Op.*, 2017 U.S. Dist. LEXIS 10507, at \*49–50; *see* ER-010 (stating "plaintiffs failed to plead that Carrier failed to satisfy its obligations under the warranty because the plaintiffs did not allege that there was any further failure or malfunction of their HVAC units after the injections of A/C Re-New").

In *Livingston*, on the other hand, the court declined to follow the *Oddo* decisions and upheld implied warranty claims against Trane based on materially identical allegations to those here.[7] *See Livingston*, 2019 U.S. Dist. LEXIS 15497, at \*2–5. The *Livingston* court held the plaintiffs plausibly alleged their air conditioners were "defective at the time of sale because . . . [t]he defect arises from a chemical rust inhibitor installed before the system was sold," and, "importantly," held that a good can be "defective at the time of sale even if it functions for several years after the sale." *Id.* at \*38. (internal quotations and citations omitted).

The *Livingston* court correctly interpreted the law. The district court decision here was wrong for several reasons.

First, what matters for an implied warranty of merchantability claim is the condition of the product *at the time of sale*. "To establish a prima facie case of

---

[7] The same counsel drafted both the *Livingston* complaint and Shoner's complaint, and, therefore, many, if not most, of the substantive allegations in *Livingston* were identical.

breach of implied warranty, a plaintiff must show that goods were defective when they left the possession of the manufacturer or seller . . . ." *Guaranteed Constr. Co. v. Gold Bond Prods.*, 395 N.W.2d 332, 336 (Mich. Ct. App. 1986); *see generally Heber v. Toyota Motor Sales, U.S.A., Inc.*, 823 F. App'x 512, 515 (9th Cir. 2020) (unpublished) (holding that what matters for an implied warranty claim is the condition at the time of sale); *Roberts v. Electrolux Home Prods.*, 2013 U.S. Dist. LEXIS 185488, at *18–19 (C.D. Cal. Mar. 4, 2013) ("A breach of the warranty of merchantability occurs when a product containing a latent defect is sold . . . ."). Here, there is no serious question that Shoner's air conditioner contained a latent defect at the time it left Carrier's factory. *E.g.*, ER-024–025 ¶¶ 1–3; ER-025–026 ¶ 5; ER-033 ¶¶ 30–31.

Moreover, it is well established that even successful repairs do not preclude a claim for breach of the implied warranty of merchantability. *See, e.g.*, *Comput. Network, Inc. v. AM Gen. Corp.*, 696 N.W.2d 49, 56 (Mich. Ct. App. 2005) (holding that no *express* warranty claim would lie where the manufacturer complied with its obligations to repair under the warranty, but that such repairs did not require dismissal of implied warranty claims where there was a genuine question of fact whether the vehicle was, *inter alia*, "not of average quality"); *see also, e.g.*, *Robinson v. Freightliner, LLC*, 2010 U.S. Dist. LEXIS 22266, at *4–5 (M.D. Pa. Mar. 10, 2010) (successful repair under warranty does not defeat an

implied warranty claim); *Mocek v. Alfa Leisure, Inc.*, 7 Cal. Rptr. 3d 546, 547 (Cal. Ct. App. 2003) ("[T]here is no requirement the seller be given an opportunity to repair when the implied warranty of merchantability is breached.").

Courts also regularly allow claims for breach of the implied warranty of merchantability where, like here, the plaintiff paid for a repair. *See, e.g.*, *In re Saturn L-Series Timing Chain Prods. Liab. Litig.*, 2008 U.S. Dist. LEXIS 109978, at *32–34 (D. Neb. Nov. 7, 2008); *Roe*, 2019 U.S. Dist. LEXIS 130956, at *37; *Asghari v. Volkswagen Grp. of Am., Inc.*, 42 F. Supp. 3d 1306, 1339 (C.D. Cal. 2013); *Baranco v. Ford Motor Co.*, 294 F. Supp. 3d 950, 977 (N.D. Cal. 2018) (finding breach of implied warranty of merchantability claim sufficiently pled where "all Plaintiffs except one have paid for repairs to correct the allegedly hazardous defect"); *see also Falco v. Nissan N. Am. Inc.*, 2016 U.S. Dist. LEXIS 46115, at *6, 30 (C.D. Cal. Apr. 5, 2016) (certifying breach of implied warranty class of owners who "incurred actual expenses" from diagnosis and repair of defect).

Of course, here, Shoner alleges that the post-sale repairs did not actually address the root cause of the defect and, in fact, resulted in the addition of more contaminants and additional damage. ER-025 ¶ 4; ER-033–037 ¶¶ 32–51. Thus, the repair history in no way justifies dismissing his implied warranty claim.

Further, by focusing solely on functionality at the time of suit, the district court overlooked that products can perform their basic function but nevertheless fail to be merchantable because they are objectionable in the trade, are not of average quality, or for other reasons. In other words, the mere fact that a product currently performs its most basic function is not the sole determinant of merchantability.

"There are a number of examples of courts which have held that a defect can render a product unfit notwithstanding the fact the product at issue could, in a technical sense, perform its base function." *In re Carrier IQ, Inc., Consumer Privacy Litig.*, 78 F. Supp. 3d 1051, 1109 (N.D. Cal. 2015).

For example, "that a person may sleep on a moldy bed does not bar as a matter of law a claim for breach of implied warranty of merchantability." *Stearns v. Select Comfort Retail Corp.*, 2009 U.S. Dist. LEXIS 48367, at *26 (N.D. Cal. June 5, 2009). Similarly, a trailer can be objectionable in the trade, and therefore unmerchantable, simply because it bears the wrong model year, even though there is no functional deficiency. *Terrell v. R & A Mfg. Partners, Ltd.*, 835 So. 2d 216, 228 (Ala. Civ. App. 2002). Likewise, "a roof which is not flat and smooth and whose shingles curl up at the edges and fail to seal cannot be said to 'pass without objection in the trade,' . . . even if it does shield the structure from the elements." *Frantz v. Cantrell*, 711 N.E.2d 856, 860 (Ind. Ct. App. 1999); *see also Isip v.*

*Mercedes-Benz USA, LLC*, 65 Cal.Rptr.3d 695, 700 (Cal. Ct. App. 2007) ("We reject the notion that merely because a vehicle provides transportation from point A to point B, it necessarily does not violate the implied warranty of merchantability."); *Fleisher v. Fiber Composites, LLC*, 2012 U.S. Dist. LEXIS 157343, at *22–23 (E.D. Pa. Nov. 2, 2012) (failure to meet "a certain aesthetic expectation" can render a product unmerchantable).

In fact, several courts have held that mere odor from the air conditioner can render an entire motor vehicle unmerchantable—even though an air conditioner is not necessary to the function of transportation, and odor does not affect the function of cooling the air. *See Stockinger v. Toyota Motor Sales USA, Inc.*, 2017 U.S. Dist. LEXIS 224071, at *38 (C.D. Cal. July 7, 2017) (allowing implied warranty claim to go forward where a vehicle air conditioner emitted odor and concluding that whether the odor rendered the vehicle unmerchantable was a question of fact); *Salas v. Toyota Motor Sales, U.S.A., Inc.*, 2016 U.S. Dist. LEXIS 195222, at *34 (C.D. Cal. Sept. 27, 2016) (holding that plaintiffs stated a claim for breach of implied warranty of merchantability where vehicle air conditioner grew mold that caused odor); *see also Cty. of Westchester v. Gen. Motors Corp.*, 555 F. Supp. 290, 293 (S.D.N.Y. 1983) (holding the "trier of fact may find that a bus which is so designed and constructed that the air conditioning system is doomed to fail . . . is not a vehicle which is reasonably fit"); *Hodges v. Johnson*, 199 P.3d

37

1251, 1261 (Kan. 2009) (vehicle was not fit for ordinary purpose because the air conditioner emitted odor and broke down).

Here, the district court erred in holding that Shoner cannot state a claim for breach of implied warranty merely because his air conditioner was operable at the time of the complaint (particularly since he paid hundreds of dollars after purchase to make it that way). *See* ER-010; ER-040 ¶¶ 63–64; *Oddo Mot. Dismiss Op.*, 2017 U.S. Dist. LEXIS 10507at *49. In reaching that conclusion, the district court relied on two cases applying California law, in which the plaintiffs alleged that their air conditioner copper coils were susceptible to formicary corrosion, but those cases are readily distinguishable. *See Oddo Mot. Dismiss Op.*, 2017 U.S. Dist. LEXIS 10507, at *49–50 (citing *Sumer v. Carrier Corp.*, 2015 U.S. Dist. LEXIS 20731, at *3 (N.D. Cal. Feb. 20, 2015); *Grassi v. Int'l Comfort Prods., LLC*, 2015 U.S. Dist. LEXIS 107467, at *11-12 (E.D. Cal. Aug. 13, 2015)). Copper coils are commonly used in the industry, and the plaintiffs in those cases never alleged that they are objectionable in the trade nor that they fell below average quality. Instead, the claims were based on allegations that copper coils can sometimes develop pinhole leaks. *See Sumer*, 2015 U.S. Dist. LEXIS 20731, at *2; *Grassi*, 2015 U.S. Dist. LEXIS 107467, at *2. In both cases the courts found the implied warranty claims were untimely and, further, the manufacturers eventually provided replacement

aluminum coils, which are not subject to formicary corrosion. *Sumer*, 2015 U.S. Dist. LEXIS 20731, at *2-3; *Grassi*, 2015 U.S. Dist. LEXIS 107467, at *11-12.

In *Siriano*, 2015 U.S. Dist. LEXIS 191458, at *36–38, on the other hand, which was another formicary corrosion case, the court upheld the implied warranty claims where the claims were timely and even though the manufacturer had complied with the terms of its express warranty by providing replacement copper coils. Indeed, the *Siriano* court noted that, "just because the *consequences* of this design flaw did not surface immediately does not necessarily mean the defect was not present at the time it left Goodman's control." *Id.* at *37.

*Sumer* and *Grassi* do not govern the viability of Shoner's claims here where: (1) the claims were timely; (2) there is a clear manufacturing defect that is objectionable in the trade; (3) the defect causes the contaminated air conditioners to fall below average quality due to widespread TXV failures; and (4) the defect has never been resolved by removing the contamination from Shoner's air conditioner.[8] *See, e.g.*, ER-024 ¶ 1; ER-033 ¶ 30; ER-034 ¶ 33; ER-037 ¶ 53; ER-040 ¶ 64; ER-044–045 ¶ 80; ER-067.

---

[8] *Williams v. United Techs. Corp.*, 2015 U.S. Dist. LEXIS 159814, at *19 (W.D. Mo. Nov. 30, 2015), applying Missouri law, on which the district court also relied, is also distinguishable but was wrongly decided too. There the court held that two failures over eight years, where the manufacturer complied with the express warranty by replacing the defective component, was not sufficient to state a claim for breach of implied warranty. *Id.* at *19–21. As noted above, under Michigan and other states' laws, compliance with the repair warranty is not dispositive of an

Neither Rule 8 nor Michigan law sets a high bar to plead an implied warranty claim. In fact, where a specific manufacturing defect has been identified, as it has been here, a single product failure, even if repaired, has been held sufficient to state a prima facie claim. *In re Saturn L-Series*, 2008 U.S. Dist. LEXIS 109978, at *32–34 (applying Michigan law); *see also Roe*, 2019 U.S. Dist. LEXIS 130956, at *36–37 (upholding implied warranty of merchantability claim at pleading stage even though the vehicle water pump lasted for tens of thousands of miles before failing); *Asghari*, 42 F. Supp. 3d at 1339 (quoting *Hornberger v. General Motors Corp.*, 929 F. Supp. 884, 888 (E.D. Pa. 1996)) ("[A] material question of fact does exist as to whether a normal transmission of a newly leased vehicle would fail after being driven approximately 40,000 miles, rendering the car unfit for the purpose of driving and, therefore, unmerchantable."). Shoner easily meets the low pleading bar here.

Finally, whether or not Shoner's air conditioner was "unmerchantable at the time of sale is a question of fact the Court cannot resolve at the pleadings stage." *In re GM LLC CP4 Fuel Pump Litig.*, 393 F. Supp. 3d 871, 883 (N.D. Cal. 2019); *see also Baranco*, 294 F. Supp. 3d at 977 ("The severity of these issues and the extent

---

implied warranty claim. *See, e.g.*, *Comput. Network, Inc.*, 696 N.W.2d at 56. But, in any event, here, unlike *Williams*, Shoner alleges that Carrier failed to comply with the terms of the warranty and instead advised service personnel to inject a second harmful additive. ER-025 ¶ 4; ER-034 ¶ 33; ER-037 ¶ 51.

to which they may have rendered the vehicle unmerchantable is a question of fact."); *Spirit Aerosystems, Inc. v. SPS Techs., LLC*, 2013 U.S. Dist. LEXIS 168696, at *12 (D. Kan. Nov. 27, 2013) ("[T]he ultimate determination of whether an implied warranty of merchantability has been breached is a question of fact."); *Robinson v. Freightliner, LLC*, 2010 U.S. Dist. LEXIS 22291, at *14–15 (M.D. Pa. Mar. 10, 2010) ("[T]he existence of the defects themselves *could* lead a reasonable jury to conclude that the motor home in question was not free of substantial defects . . . . [so the question whether the product is merchantable] is better left for the jury to determine."). The district court erred in dismissing Shoner's claim for breach of implied warranty of merchantability on a motion to dismiss.

## III.  The district court erred in dismissing Shoner's express warranty claim.

Shoner's express warranty claim is straightforward. Carrier "warrants [its] product[s] against failure due to defect in materials or workmanship under normal use and maintenance . . . ." ER-021. The warranty further states that if a part fails due to defect, then Carrier will provide free replacement parts (but not labor) to replace the defective parts. *See id.*

Carrier's air conditioners are defective because they were manufactured with an unapproved rust inhibitor in the compressor. ER-024 ¶ 1; ER-033 ¶ 30; ER-044–045 ¶ 80; ER-067. Further, instead of providing replacement parts sufficient to remove all of the contaminant when failures occurred, Carrier advised service

41

personnel to inject A/C Re-New, which does not remove the contaminant and causes significant damage. ER-025 ¶ 4; ER-033–037 ¶¶ 32–50. Thus, Carrier failed to comply with its warranty obligations. ER-033–034 ¶¶ 32–33; ER-060 ¶ 161.

To the extent Carrier's warranty *permits* a repair that does nothing to remove the unapproved rust inhibitor and, in fact, creates more damage, the warranty fails of its essential purpose. ER-025 ¶ 4; ER-034 ¶ 35; ER-061 ¶ 169.

Once again, the court in *Livingston* permitted the same express warranty claims to proceed under the same facts, whereas the district here improperly dismissed them. 2019 U.S. Dist. LEXIS 15497, at *35–37, 43–44, 48–50, 52–54, 56–58; ER-010.

### A. Carrier breached its express warranty when it sold air conditioners containing a manufacturing defect and again when it failed to replace necessary parts.

The district court held that Carrier satisfied "its obligations under the warranty because the plaintiff[ ] did not allege that there was any further failure or malfunction of [his] HVAC unit[ ] after the injection[ ] of A/C Re-New." ER-010. The mere fact that Shoner's air conditioner was operating after an injection of A/C Re-New does not mean that Carrier satisfied its warranty obligations, however.

In *Livingston*, the court refused to dismiss the same claims against Trane based on virtually identical factual allegations. Like Carrier, Trane's warranty provided an express "limited warranty against manufacturing defects" with respect

to "all parts," and promised that Trane would provide free parts, but not labor, "to replace any . . . part that fails due to a manufacturing defect under normal use and maintenance." *Livingston*, 2019 U.S. Dist. LEXIS 15497, at \*36 n.24. Like Carrier, Trane sold air conditioners that contained contaminated Emerson compressors and then instructed service personnel to inject the acidic additive, which Trane called MJ-X, when failures occurred. *Id.* at \*3–4. Plaintiffs in *Livingston* also made the exact same allegations as Shoner concerning the harm caused by the additive. *See id.*

The *Livingston* court held that the plaintiffs stated a claim—under five state's enactments of the UCC identical in material respects to the Michigan UCC—for two kinds of breach of express warranty: first, plaintiffs stated a claim for breach of warranty with respect to "the quality or description" of the product, and second, they stated a claim for breach of the "promise[] . . . [to] repair or replace defective parts during the warranty period." *Id.* at \*36 n.24. The court declined to follow the *Oddo* decision and, instead, held that "the mere fact that a unit remains operational does not . . . rule out the possibility that Defendant 'refused to provide adequate repairs as required by its own warranty' and thus caused damages to Plaintiff." *Id.* at \*33 (citation omitted).

No other conclusion makes sense.

43

Carrier's warranty states that it "warrants [its] product[s] against failure due to defect in materials or workmanship under normal use and maintenance . . . ." ER-021. Stated another way, Carrier warrants that its products do not contain functional defects. *See id.* Yet Carrier acknowledged that the unapproved rust inhibitor was the root cause of widespread TXV failures. ER-033 ¶ 30. As the court in *Livingston* concluded, this is sufficient to state a claim for breach of a warranty "related to the quality or description" of goods. 2019 U.S. Dist. LEXIS 15497, at *36 n.23. The same is true under Michigan law. Mich. Comp. Laws § 440.2313; *Grosse Pointe law Firm, PC v. Jaguar Land Rover N. Am., LLC*, 894 N.W.2d 700, 705 (Mich. Ct. App. 2016) (describing an express warranty as one that describes "the character or quality of the goods").

Separately, Carrier's warranty makes a remedial promise: in the event of a failure due to a manufacturing defect, Carrier will provide replacement parts to replace the failed defective parts. ER-033–034 ¶ 32; ER-021.

Nothing in Carrier's warranty permits it to inject a harmful additive, nor is that a reasonable interpretation of the remedial promise Carrier made.[9] *UAW-GM*,

---

[9] If, however, the warranty was ambiguous or susceptible to different meanings, then the proper interpretation of the warranty is a question of fact that should not have been resolved at the pleadings stage. *See, e.g.*, *UAW-GM Human Res. Ctr. v. KSL Rec. Corp.*, 579 N.W.2d 411, 414 (Mich. Ct. App. 1998); *Pearson & Son Excavating Co. v. W. Rec. Vehicles, Inc.*, 2005 U.S. Dist. LEXIS 47484, at *16 (E.D. Mich. Dec. 28, 2005) ("If it is ambiguous, the court must construe the ambiguous provision against the drafter.").

579 N.W.2d at 414 ("The primary goal in the construction or interpretation of any contract is to honor the intent of the parties."); *Pearson & Son Excavating Co. v. W. Rec. Vehicles, Inc.*, 2005 U.S. Dist. LEXIS 47484, at *15 (E.D. Mich. Dec. 28, 2005) (applying Michigan contract interpretation rules to warranty claims).[10] Injecting a harmful additive is "inconsistent with the Warranty's plain language." *McKee v. GM LLC*, 376 F. Supp. 3d 751, 757 (E.D. Mich. 2019).

The *Livingston* court is not alone. Many courts have permitted express warranty claims to proceed based on allegations that a repair provided under warranty was itself defective. For example, in *In re Toyota Motor Corp. Unintended Acceleration Marketing, Sales Practices, & Products Liability Litigation*, 754 F. Supp. 2d 1145, 1178 (C.D. Cal. Nov. 30, 2010), in applying the UCC law of several states including Michigan, the court refused to dismiss breach of warranty claims where "[t]he essence of Plaintiffs' allegations regarding repairs is that . . . *any purported repair was itself defective . . . .*" (emphasis added). *See also Benkle v. Ford Motor Co.*, 2017 U.S. Dist. LEXIS 222317, at *37–38 (C.D. Cal. Dec. 22, 2017) (holding plaintiffs had "plausibly alleged a breach of

---

[10] To conclude that Carrier's limited warranty permitted it to conduct a repair that does not adequately repair the defect—let alone a "repair" that causes more harm—would permit an unreasonable result, which must be avoided. *Hastings Mut. Ins. Co. v. Safety King Inc.*, 778 N.W.2d 275, 281 (Mich. Ct. App. 2009) ("[C]ontracts are to be interpreted to avoid absurd or unreasonable conditions and results.").

express warranty on the theory that Defendant failed to provide adequate repairs under the terms of its Limited Warranty" where the proffered fix "did not address the underlying problem in their vehicles"); *T.J. McDermott Transp. Co. v. Cummins, Inc.*, 2015 U.S. Dist. LEXIS 29678, at *27 (D.N.J. Mar. 11, 2015) (permitting claims to proceed where "[d]efendants made repair efforts during the warranty period, but failed to remedy the substandard materials and workmanship."); *cf. Keegan v. Am. Honda Motor Co.*, 284 F.R.D. 504, 512–13, 550 (C.D. Cal. 2012) (granting class certification on breach of express warranty claims where some of the class members had an allegedly defective component replaced through "goodwill programs" but alleged that the repair was inadequate because it did not "address the underlying problem").

Carrier may debate which parts it was required to replace under the warranty, but there is no reading of the warranty that allows compliance by injecting a harmful additive. The district court erred in dismissing Shoner's breach of warranty claim merely because his air conditioner was working after injection with A/C Re-New.

### B. If Carrier's warranty was insufficient to actually remedy the defect, then the warranty failed of its essential purpose.

To the extent Carrier's warranty *permits* Carrier to provide replacement parts that do not actually remove the unapproved rust inhibitor or, worse yet, to inject acidic A/C Re-New, which causes serious damage, then the warranty fails of

its essential purpose. The district court erred in holding that merely because the injection of A/C Re-New restored Shoner's unit to a "workable" condition, the limited replacement remedy did not fail of its essential purpose. ER-010; *Oddo Mot. Dismiss Op.*, 2017 U.S. Dist. LEXIS 10507, at *37; *Oddo Mot. Leave to Amend Op.*, 2017 U.S. Dist. LEXIS 129152, at *38–39. The essential purpose of the warranty is to replace defective parts, and that purpose is not fulfilled by injecting A/C Re-New.

The UCC permits the parties to limit the buyer's remedy for seller's breach of warranty. Mich. Comp. Laws § 440.2719(1). The limitation, however, must provide "at least minimum adequate remedies." *Jellison v. Fleetwood Enters.*, 2004 U.S. Dist. LEXIS 28835, at *24 (E.D. Mich. Apr. 7, 2004) (quoting § 440.2719, cmt. 1.). Thus, under § 440.2719(2), "where the limited remedy fails in its purpose or operates to deprive either party of the value of the bargain," a plaintiff may pursue other remedies available under the UCC. *Kelynack v. Yamaha Motor Corp.*, 394 N.W.2d 17, 19–22 (Mich. Ct. App. 1986). Whether a warranty fails in its essential purpose is a question of fact. *See, e.g.*, *Hindsman v. GM LLC*, 2018 U.S. Dist. LEXIS 92319, at *32–33 (N.D. Cal. June 1, 2018) (denying motion to dismiss where plaintiffs "plausibly alleged that they requested repairs of the Oil Consumption Defect within the SCA warranties period but GM refused to perform the repair").

Failure to honor the terms of the warranty's limited remedy "represents a failure of essential purpose." *Fiorito Bros., Inc. v. Fruehauf Corp.*, 747 F.2d 1309, 1313 (9th Cir. 1984); *see also Electrojet Inc. v. Irbit Motorworks of Am.*, 2020 U.S. Dist. LEXIS 112269, at *18 (E.D. Mich. Apr. 9, 2020) (quoting *Severn v. Sperry Corp.*, 538 N.W.2d 50, 55 (Mich. Ct. App. 1995)) ("[T]he Michigan Court of Appeals held that a Defendants' refusal to make repairs sufficed to show that a 'limited written warranty failed of its essential purpose.'"); *Argabright*, 201 F. Supp. 3d at 594 (emphasis added) ("Had [the air conditioning manufacturer] *refused* to repair or replace the nonworking coils . . . Plaintiffs would have a fair claim that the remedy contemplated under the Warranty failed of its essential purpose.").

Moreover, Carrier's proffered repair of an additive injection "is an illusory one which represents no remedy at all." *Latimer*, 368 N.W.2d at 625; *see also Bosway Tube & Steel Corp. v. McKay Mach. Co.*, 237 N.W.2d 488, 490 (Mich. Ct. App. 1975) (affirming failure of essential purpose where "several defects were never corrected by defendant"). Carrier never provided all of the parts necessary to actually remove the rust inhibitor. *Cf. In re MyFord Touch Consumer Litig.*, 46 F. Supp. 3d 936, 972 (N.D. Cal. 2014) (noting significance of allegations that, even after repairs, "there is still an underlying systemic defect"). Here, removing the contaminant would have required replacement of most of the internal parts,

including the compressor. ER-033–034 ¶ 32. Adding A/C Re-New only makes matters worse. Not only does Shoner's unit contain the original contaminant, it has been further damaged by A/C Re-New. ER-034–037 ¶¶ 36–51; ER-040 ¶ 64.

Just because the unit is currently working, does not mean that the limited remedy's essential purpose was served. "The purpose of the warranty is to *actually* fix or repair any defect in a reasonable amount of time . . . ." *Gomez v. Mercedes-Benz USA, LLC*, 2018 Mich. App. LEXIS 314, at *10 (Mich. Ct. App. Feb. 20, 2018) (unpublished). As this Court has recognized, the Court must "examine the contract in general and the remedy provision in particular to determine what the remedy's essential purpose is and whether it has failed." *Milgard Tempering v. Selas Corp. of Am.*, 902 F.2d 703, 707 (9th Cir. 1990).

Carrier "warrant[ed] the product against failures due to defect in material or workmanship," and promised to provide replacement parts in the event of a failure. ER-021. Thus, the essential purpose of the warranty was to provide an air conditioner that does not contain defective parts. That purpose was defeated when Carrier elected not to provide parts sufficient to remove the rust inhibitor from the system and, instead, added a harmful chemical to the system. ER-033–034 ¶¶ 32–35; ER-057 ¶ 144.

Finally, pleading failure of essential purpose requires only that plaintiff "sought the limited remedy in the warranty period and that the remedy was

ineffective." *Wozniak v. Ford Motor Co.*, 2019 U.S. Dist. LEXIS 1339, at *6 (E.D. Mich. Jan. 4, 2019).[11] Beyond that, whether a warranty fails of its essential purpose is typically a question of fact. *Forjas Y Macquinados, S.A. De C.V. v. Mectron Eng'g Co.*, 2019 U.S. Dist. LEXIS 21535, at *9 (E.D. Mich. Feb. 11, 2019); *Farley v. Country Coach, Inc.*, 2006 U.S. Dist. LEXIS 95728, at *15 (E.D. Mich. Nov. 14, 2006); *Albright v. Sherwin-Williams Co.*, 2019 U.S. Dist. LEXIS 187418, at *29 (N.D. Ohio Jan. 29, 2019).

The district court erred when it held, as a matter of law, that Carrier's warranty did not fail of its essential purpose.

## IV. The district court erred in dismissing Shoner's MMWA claim because he sufficiently alleges breach of implied and express warranty claims under state law.

The MMWA provides remedies in federal court for breaches of express and implied warranty under state law. Because the district court dismissed all of Shoner's claims for breaches of implied and express warranty under Michigan law, it dismissed his MMWA claim too. *See* ER-010–011; *Oddo Mot. Dismiss Op.*, 2017 U.S. Dist. LEXIS 10507 at *47, *50. But, for the reasons stated above,

---

[11] In *Oddo*, the district court noted that "plaintiffs' allegations with respect to the *potential* damage caused by A/C Re-New are speculative and do not establish that the repairs were unsuccessful." *Oddo Mot. Dismiss Op.*, 2017 U.S. Dist. LEXIS 10507 at *40. Here, Shoner alleges, in detail, the harms of A/C Re-New based on testing that Emerson conducted. ER-034–037 ¶¶ 36–50. But more to the point, whether an injection of A/C Re-New constituted a successful repair is a question of fact.

Shoner *does* state a claim for breaches of implied and express warranty under state law. Therefore, the district court erred in dismissing his MMWA claim.

The MMWA claim "stand[s] or fall[s] with [Shoner's] express and implied warranty claims under state law." *Clemens v. DaimlerChrysler Corp.*, 534 F.3d 1017, 1022 (9th Cir. 2008). The MMWA provides a cause of action to any consumer "who is damaged by the failure of a . . . warrantor . . . to comply with any obligation . . . under a written warranty, implied warranty, or service contract." 15 U.S.C. § 2310(d)(1).

Shoner complied with the MMWA notice requirement, as discussed above and as the court concluded based on materially identical facts in *Livingston*. 15 U.S.C. § 2310(e); *Livingston*, 2019 U.S. Dist. LEXIS 15497 *7–8.

Further, for the reasons stated above, Shoner states prima facie claims for breaches of the implied warranty of merchantability and express warranty under the Michigan UCC and, therefore, dismissal of his MMWA claim was improper. *See, e.g.*, *Lohr v. Nissan N. Am., Inc.*, 2017 U.S. Dist. LEXIS 38934, at *26 (W.D. Wash. Mar. 17, 2017) ("Because Plaintiffs plead a valid state-law breach of express warranty claim, dismissal of Plaintiffs' MMWA express warranty claims . . . is improper."); *Cunningham v. Ford Motor Co.*, 2015 U.S. Dist. LEXIS 198138, at *9 (S.D. Cal. Dec. 7, 2015) ("Plaintiff has adequately alleged a breach of the

51

implied warranty of merchantability, therefore the Court cannot dismiss Plaintiff's

MMWA claim on that basis.").

## **CONCLUSION**

The district court erroneously dismissed all of Shoner's implied and express

warranty claims, like it did in *Oddo*, based solely on the fact that Shoner's air

conditioner was operating after he paid hundreds of dollars on repairs and after

injection of A/C Re-New. This was error. The fact that a product currently

performs its most basic function does not mean the product was necessarily

merchantable at the time of sale, particularly where the plaintiff has paid for a

repair to make it so. Nor does current functionality necessarily mean Carrier

complied with its express warranty obligations. Shoner adequately states prima

facie claims for breach of implied and express warranty—particularly under liberal

Rule 8 pleading standards. This Court should reverse the dismissal of Shoner's

claims for breach of the implied warranty of merchantability, breach of express

warranty, and for violation of the MMWA.


DATED: April 26, 2021        By:    */s/ Timothy N. Mathews*
                                    Timothy N. Mathews
                                    Zachary P. Beatty
                                    **CHIMICLES SCHWARTZ**
                                    **KRINER & DONALDSON-SMITH LLP**
                                    One Haverford Centre
                                    361 West Lancaster Avenue
                                    Haverford, PA 19041

52

Telephone: (610) 642-8500
Facsimile: (610) 649-3633
Email: tnm@chimicles.com
zpb@chimicles.com

James C. Shah
**MILLER SHAH LLP**
1845 Walnut Street, Suite 806
Philadelphia, PA 19103
Telephone: (610) 891-9880
Telephone: (610) 891-9880
Facsimile: (866) 300-7367
Email: jcshah@millershah.com

Kolin C. Tang
**MILLER SHAH LLP**
1401 Dove Street
Suite 540
Newport beach, CA 90660
Telephone: (323) 510-4060
Facsimile: (866) 300-7367
Email: kctang@millershah.com

## STATEMENT OF RELATED CASES

Appellant is unaware of any related cases pending in this Court.

## CERTIFICATE OF COMPLIANCE

This brief contains 12,532 words**,** excluding the items exempted by Fed. R.

App. P. 32(f). The brief's type size and typeface comply with Fed. R. App. P.

32(a)(5) and (6).

I certify that this brief complies with the word limits of Cir. R. 32-1.

Dated: April 26, 2021                    */s/ Timothy N. Mathews*
                                         Timothy N. Mathews

                                         *Attorney for Appellant*

**CERTIFICATE OF SERVICE**

I hereby certify that on April 26, 2021, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and will be served by the appellate CM/ECF system.

Dated: April 26, 2021                             */s/ Timothy N. Mathews*
                                                 Timothy N. Mathews

                                                 *Attorney for Appellant*

# ADDENDUM

# TABLE OF CONTENTS

15 U.S.C. § 2310. Remedies in consumer disputes .................................................58

Mich. Comp. Laws § 440.2313. Creation of express warranties by seller..............63

Mich. Comp. Laws § 440.2314. Implied warranty; merchantability,
course of dealing, usage of trade ....................................................................64

Mich. Comp. Laws § 440.2607. Acceptance of goods; effect;
notice of breach; burden of establishing breach; notice of claim
or litigation to person answerable...................................................................65

Mich. Comp. Laws § 440.2719. Contractual modification
or limitation of remedies.................................................................................67

**15 U.S.C. § 2310. Remedies in consumer disputes**

**(a) Informal dispute settlement procedures; establishment; rules setting forth minimum requirements; effect of compliance by warrantor; review of informal procedures or implementation by Commission; application to existing informal procedures.**

**(1)** Congress hereby declares it to be its policy to encourage warrantors to establish procedures whereby consumer disputes are fairly and expeditiously settled through informal dispute settlement mechanisms.

**(2)** The Commission shall prescribe rules setting forth minimum requirements for any informal dispute settlement procedure which is incorporated into the terms of a written warranty to which any provision of this title [15 USCS §§ 2301 et seq.] applies. Such rules shall provide for participation in such procedure by independent or governmental entities.

**(3)** One or more warrantors may establish an informal dispute settlement procedure which meets the requirements of the Commission's rules under paragraph (2). If—

**(A)** a warrantor establishes such a procedure,

**(B)** such procedure, and its implementation, meets the requirements of such rules, and

**(C)** he incorporates in a written warranty a requirement that the consumer resort to such procedure before pursuing any legal remedy under this section respecting such warranty,

then (i) the consumer may not commence a civil action (other than a class action) under subsection (d) of this section unless he initially resorts to such procedure; and (ii) a class of consumers may not proceed in a class action under subsection (d) except to the extent the court determines necessary to establish the representative capacity of the named plaintiffs, unless the named plaintiffs (upon notifying the defendant that they are named plaintiffs in a class action with respect to a warranty obligation) initially resort to such procedure. In the case of such a class action which is brought in a district court of the United States, the representative capacity of the named plaintiffs shall be established in the application of

58

rule 23 of the Federal Rules of Civil Procedure [USCS Federal Rules of Civil Procedure, Rule 23]. In any civil action arising out of a warranty obligation and relating to a matter considered in such a procedure, any decision in such procedure shall be admissible in evidence.

**(4)**  The Commission on its own initiative may, or upon written complaint filed by any interested person shall, review the bona fide operation of any dispute settlement procedure resort to which is stated in a written warranty to be a prerequisite to pursuing a legal remedy under this section. If the Commission finds that such procedure or its implementation fails to comply with the requirements of the rules under paragraph (2), the Commission may take appropriate remedial action under any authority it may have under this title [15 USCS §§ 2301 et seq.] or any other provision of law.

**(5)**  Until rules under paragraph (2) take effect, this subsection shall not affect the validity of any informal dispute settlement procedure respecting consumer warranties, but in any action under subsection (d), the court may invalidate any such procedure if it finds that such procedure is unfair.

**(b) Prohibited acts.**  It shall be a violation of section 5(a)(1) of the Federal Trade Commission Act (15 U.S.C. 45(a)(1)) for any person to fail to comply with any requirement imposed on such person by this title [15 USCS §§ 2301 et seq.] (or a rule thereunder) or to violate any prohibition contained in this title [15 USCS §§ 2301 et seq.] (or a rule thereunder).

**(c) Injunction proceedings by Attorney General or Commission for deceptive warranty, noncompliance with requirements, or violating prohibitions; procedures; definitions.**

**(1)**  The district courts of the United States shall have jurisdiction of any action brought by the Attorney General (in his capacity as such), or by the Commission by any of its attorneys designated by it for such purpose, to restrain (A) any warrantor from making a deceptive warranty with respect to a consumer product, or (B) any person from failing to comply with any requirement imposed on such person by or pursuant to this title [15 USCS §§ 2301 et seq.] or from violating any prohibition contained in this title [15 USCS USCS §§ 2301 et seq.]. Upon proper showing that, weighing the equities and considering the Commission's or Attorney General's likelihood of ultimate success, such action would be in the

public interest and after notice to the defendant, a temporary restraining order or preliminary injunction may be granted without bond. In the case of an action brought by the Commission, if a complaint under section 5 of the Federal Trade Commission Act [15 USCS § 45] is not filed within such period (not exceeding 10 days) as may be specified by the court after the issuance of the temporary restraining order or preliminary injunction, the order or injunction shall be dissolved by the court and be of no further force and effect. Any suit shall be brought in the district in which such person resides or transacts business. Whenever it appears to the court that the ends of justice require that other persons should be parties in the action, the court may cause them to be summoned whether or not they reside in the district in which the court is held, and to that end process may be served in any district.

**(2)** For the purposes of this subsection, the term "deceptive warranty" means (A) a written warranty which (i) contains an affirmation, promise, description, or representation which is either false or fraudulent, or which, in light of all of the circumstances, would mislead a reasonable individual exercising due care; or (ii) fails to contain information which is necessary in light of all of the circumstances, to make the warranty not misleading to a reasonable individual exercising due care; or (B) a written warranty created by the use of such terms as "guaranty" or "warranty", if the terms and conditions of such warranty so limit its scope and application as to deceive a reasonable individual.

**(d) Civil action by consumer for damages, etc.; jurisdiction; recovery of costs and expenses; cognizable claims.**

**(1)** Subject to subsections (a)(3) and (e), a consumer who is damaged by the failure of a supplier, warrantor, or service contractor to comply with any obligation under this title [15 USCS §§ 2301 et seq.], or under a written warranty, implied warranty, or service contract, may bring suit for damages and other legal and equitable relief—

**(A)** in any court of competent jurisdiction in any State or the District of Columbia; or

**(B)** in an appropriate district court of the United States, subject to paragraph (3) of this subsection.

**(2)** If a consumer finally prevails in any action brought under paragraph (1) of this subsection, he may be allowed by the court to recover as part

of the judgment a sum equal to the aggregate amount of cost and expenses (including attorneys' fees based on actual time expended) determined by the court to have been reasonably incurred by the plaintiff for or in connection with the commencement and prosecution of such action, unless the court in its discretion shall determine that such an award of attorneys' fees would be inappropriate.

**(3)** No claim shall be cognizable in a suit brought under paragraph (1)(B) of this subsection—

    **(A)** if the amount in controversy of any individual claim is less than the sum or value of $25;

    **(B)** if the amount in controversy is less than the sum or value of $50,000 (exclusive of interests and costs) computed on the basis of all claims to be determined in this suit; or

    **(C)** if the action is brought as a class action, and the number of named plaintiffs is less than one hundred.

**(e) Class actions; conditions; procedures applicable.** No action (other than a class action or an action respecting a warranty to which subsection (a)(3) applies) may be brought under subsection (d) for failure to comply with any obligation under any written or implied warranty or service contract, and a class of consumers may not proceed in a class action under such subsection with respect to such a failure except to the extent the court determines necessary to establish the representative capacity of the named plaintiffs, unless the person obligated under the warranty or service contract is afforded a reasonable opportunity to cure such failure to comply. In the case of such a class action (other than a class action respecting a warranty to which subsection (a)(3) applies) brought under subsection (d) for breach of any written or implied warranty or service contract, such reasonable opportunity will be afforded by the named plaintiffs and they shall at that time notify the defendant that they are acting on behalf of the class. In the case of such a class action which is brought in a district court of the United States, the representative capacity of the named plaintiffs shall be established in the application of rule 23 of the Federal Rules of Civil Procedure [USCS Court Rules, Federal Rules of Civil Procedure, Rule 23].

**(f) Warrantors subject to enforcement of remedies.** For purposes of this section, only the warrantor actually making a written affirmation of fact, promise, or undertaking shall be deemed to have created a written warranty,

and any rights arising thereunder may be enforced under this section only against such warrantor and no other person.

## History

**HISTORY:**

Act Jan. 4, 1975, P. L. 93-637, Title I, § 110, 88 Stat. 2189.

United States Code Service
Copyright © 2021 Matthew Bender & Company, Inc.
a member of the LexisNexis Group (TM)
All rights reserved. All rights reserved.

**Mich. Comp. Laws § 440.2313. Creation of express warranties by seller.**

Sec. 2313.

(1) Express warranties by the seller are created as follows:

(a) An affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise.

(b) A description of the goods which is made part of the basis of the bargain creates an express warranty that the goods shall conform to the description.

(c) A sample or model which is made part of the basis of the bargain creates an express warranty that the whole of the goods shall conform to the sample or model.

(2) It is not necessary to the creation of an express warranty that the seller use formal words such as "warrant" or "guarantee" or that he or she have a specific intention to make a warranty, but an affirmation merely of the value of the goods or a statement purporting to be merely the seller's opinion or commendation of the goods does not create a warranty, except as provided in the art multiples sales act and Act No. 121 of the Public Acts of 1970, being sections 442.321 to 442.325 of the Michigan Compiled Laws.

**History**

Pub Acts 1962, No. 174, Art. 2, Part 3, § 2313, by § 9991 eff January 1, 1964; amended by Pub Acts 1987, No. 53, imd eff June 22, 1987, by § 3 eff December 9, 1987 (see 1987 note below).

Michigan Compiled Laws Service
Copyright © 2021 Matthew Bender & Company, Inc.
a member of the LexisNexis Group. All rights reserved.

## Mich. Comp. Laws § 440.2314. Implied warranty; merchantability, course of dealing, usage of trade.

Sec. 2314.

**(1)** Unless excluded or modified (section 2316), a warranty that the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind. Under this section the serving for value of food or drink to be consumed either on the premises or elsewhere is a sale.

**(2)** Goods to be merchantable must be at least such as

**(a)** pass without objection in the trade under the contract description; and

**(b)** in the case of fungible goods, are of fair average quality within the description; and

**(c)** are fit for the ordinary purposes for which such goods are used; and

**(d)** run, within the variations permitted by the agreement, of even kind, quality and quantity within each unit and among all units involved; and

**(e)** are adequately contained, packaged, and labeled as the agreement may require; and

**(f)** conform to the promises or affirmations of fact made on the container or label if any.

**(3)** Unless excluded or modified (section 2316) other implied warranties may arise from course of dealing or usage of trade.

## History

Pub Acts 1962, No. 174, Art. 2, Part 3, § 2314, by § 9991 eff January 1, 1964.

Michigan Compiled Laws Service
Copyright © 2021 Matthew Bender & Company, Inc.
a member of the LexisNexis Group. All rights reserved.

**Mich. Comp. Laws § 440.2607. Acceptance of goods; effect; notice of breach; burden of establishing breach; notice of claim or litigation to person answerable.**

Sec. 2607.

    **(1)**  The buyer must pay at the contract rate for any goods accepted.

    **(2)**  Acceptance of goods by the buyer precludes rejection of the goods accepted and if made with knowledge of a nonconformity cannot be revoked because of it unless the acceptance was on the reasonable assumption that the nonconformity would be seasonably cured but acceptance does not of itself impair any other remedy provided by this article for nonconformity.

    **(3)**  Where a tender has been accepted

        **(a)**  the buyer must within a reasonable time after he discovers or should have discovered any breach notify the seller of breach or be barred from any remedy; and

        **(b)**  if the claim is one for infringement or the like (subsection (3) of section 2312) and the buyer is sued as a result of such a breach he must so notify the seller within a reasonable time after he receives notice of the litigation or be barred from any remedy over for liability established by the litigation.

    **(4)**  The burden is on the buyer to establish any breach with respect to the goods accepted.

    **(5)**  Where the buyer is sued for breach of a warranty or other obligation for which his seller is answerable over

        **(a)**  he may give his seller written notice of the litigation. If the notice states that the seller may come in and defend and that if the seller does not do so he will be bound in any action against him by his buyer by any determination of fact common to the 2 litigations, then unless the seller after seasonable receipt of the notice does come in and defend he is so bound

        **(b)**  if the claim is one for infringement or the like (subsection (3) of section 2312) the original seller may demand in writing that his buyer turn over to him control of the litigation including settlement or else be

barred from any remedy over and if he also agrees to bear all expense and to satisfy any adverse judgment, then unless the buyer after seasonable receipt of the demand does turn over control the buyer is so barred.

**(6)** The provisions of subsections (3), (4) and (5) apply to any obligation of a buyer to hold the seller harmless against infringement or the like (subsection (3) of section 2312).

## History

Pub Acts 1962, No. 174, Art. 2, Part 6, § 2607, by § 9991 eff January 1, 1964.

Michigan Compiled Laws Service
Copyright © 2021 Matthew Bender & Company, Inc.
a member of the LexisNexis Group. All rights reserved.

## Mich. Comp. Laws § 440.2719. Contractual modification or limitation of remedies.

Sec. 2719.

**(1)** Subject to the provisions of subsections (2) and (3) of this section and of the preceding section on liquidation and limitation of damages

**(a)** the agreement may provide for remedies in addition to or in substitution for those provided in this article and may limit or alter the measure of damages recoverable under this article, as by limiting the buyer's remedies to return of the goods and repayment of the price or to repair and replacement of nonconforming goods or parts; and

**(b)** resort to a remedy as provided is optional unless the remedy is expressly agreed to be exclusive, in which case it is the sole remedy.

**(2)** Where circumstances cause an exclusive or limited remedy to fail of its essential purpose, remedy may be had as provided in this act.

**(3)** Consequential damages may be limited or excluded unless the limitation or exclusion is unconscionable. Limitation of consequential damages for injury to the person in the case of consumer goods is prima facie unconscionable but limitation of damages where the loss is commercial is not.

## History

Pub Acts 1962, No. 174, Art. 2, Part 7, § 2719, by § 9991 eff January 1, 1964.

Michigan Compiled Laws Service
Copyright © 2021 Matthew Bender & Company, Inc.
a member of the LexisNexis Group. All rights reserved.